CONNECTICUT LIGHT AND POWER COMPANY *v.* DEPART-
MENT OF PUBLIC UTILITY CONTROL ET AL.
(14045)

PETERS, C. J., SHEA, CALLAHAN, HULL and BORDEN, Js.

Argued January 16—decision released May 21, 1991

*Walter F. Torrance, Jr.,* with whom were *Robert P. Wax* and *Cynthia Brodhead,* for the appellant (plaintiff).

*Tatiana D. Sypko,* assistant attorney general, with whom was *Robert S. Golden, Jr.,* assistant attorney general, for the appellee (named defendant).

*Valerie J. Bryan,* for the appellee (defendant office of consumer counsel).

BORDEN, J. In this appeal, the plaintiff Connecticut Light and Power Company (CL&P) challenges the trial court's dismissal of its appeal from the administrative rate-making decision of the defendant department of public utility control (DPUC).[1] The issues are whether

[1] The office of consumer counsel (OCC) is also a defendant in this action. Pursuant to General Statutes § 16-2a, the OCC acts as "advocate for consumer interests in all matters which may affect Connecticut consumers with respect to public service companies." Section 16-2a authorizes the OCC to "appear in and participate in any regulatory or judicial proceedings, federal or state . . . in which matters affecting utility services rendered or to be rendered in this state may be involved." Therefore, OCC was made a party to the hearings on CL&P's request for a rate increase.

the trial court: (1) applied the proper standard of review to the decision of the DPUC; and (2) properly sustained the DPUC's decision that (a) disallowed a return to CL&P shareholders of approximately 10 percent of the revenues derived from CL&P's wholesale sales[2] of Millstone III capacity, and (b) concluded that CL&P's prepayments and reserves, and its gas deferred fuel balance, but not its electric deferred fuel balance, should be included in its rate base.

In July, 1988, CL&P requested an amendment to its gas and electric rate schedule. In December, 1988, after twenty-six days of hearings, the DPUC issued its decision allowing only a portion of the requested amendments. CL&P appealed, and the trial court dismissed the appeal, thereby sustaining the decision of the DPUC. CL&P appealed the decision to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023. We affirm the decision of the trial court.

I

CL&P first claims that the trial court, in rejecting its challenges to the merits of the DPUC's decision, applied an improper standard of review, namely, that the trial court subsumed the "substantial prejudice"

---

[2] CL&P defines "wholesale sales" as "[s]ales made to other utilities for subsequent resale to end-use customers. Wholesale sales are regulated exclusively by the Federal Energy Regulatory Commission (FERC) even though they may be entirely intrastate in nature. Wholesale rates are authorized by FERC for the recovery of the utility's wholesale *Cost of Service.*" (Emphasis in original.)

Closely related to the term "wholesale sales" is the term "capacity sales." A "capacity sale" is defined by CL&P as "[a] sale by a utility to another utility of the right to receive, for a specified period of time, the electric power generated by all or a portion of the *Capacity* of one or more generating units." (Emphasis in original.) Therefore, a "wholesale sale" is made pursuant to a "capacity sale." Throughout this opinion, when discussing CL&P's claims, we refer to "wholesale sales."

test of General Statutes (Rev. to 1989) § 4-183 (g)[3] into the test of General Statutes § 16-19e (a) (4),[4] which provides that the level of rates allowed must be sufficient to permit the public utility to recover its costs and attract investors. The DPUC contends that the trial court's standard of review must focus "on the justness and reasonableness of the rates as supported by the evidence on the whole record." The OCC contends that, in order to satisfy a showing of "substantial prejudice" pursuant to § 4-183 (g) of the Uniform Administrative Procedure Act (UAPA) such that a reviewing court can reverse or modify the administrative decision, CL&P must demonstrate that the rate order is "unjust and

---

[3] General Statutes (Rev. to 1989) § 4-183 (g) provides: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

Section 4-183 (g) was subsequently renumbered and the relevant text now appears in § 4-183 (j).

[4] General Statutes § 16-19e (a) (4) provides: "GUIDELINES FOR TRANSFER OF ASSETS AND FRANCHISES, PLANT EXPANSION, INTERNAL UTILITY MANAGEMENT AND RATE STRUCTURES. PUBLIC HEARING. POLICY COORDINATION AMONG STATE AGENCIES. PARTIES TO RATE PROCEEDING. (a) In the exercise of its powers under the provisions of this title, the department of public utility control shall examine and regulate the transfer of existing assets and franchises, the expansion of the plant and equipment of existing public service companies, the operations and internal workings of public service companies and the establishment of the level and structure of rates in accordance with the following principles . . . (4) that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable . . . ."

unreasonable" pursuant to § 16-19e (a) (4). In light of our recent decision in *Connecticut Light & Power Co. v. Department of Public Utility Control,* 216 Conn. 627, 583 A.2d 906 (1990) (*CL&P* v. *DPUC*), in which we addressed the same argument raised by these parties and clarified the proper standard of review, we need not elaborate on this issue.

In *CL&P* v. *DPUC,* supra, we determined that the test set forth in § 16-19e (a) (4) was embodied in § 4-183 (g) (1). "Pursuant to General Statutes § 16-35, the provisions of General Statutes § 4-183 of the [UAPA] determine the scope of judicial review for administrative appeals from decisions of the DPUC." Id., 632–33. Additionally, § 16-19e (a) (4) sets forth a test for establishing proper rates of public utilities. In *CL&P* v. *DPUC,* supra, we recognized the confusion that existed in construing § 4-183 (g), the UAPA standard of review of administrative decisions, and § 16-19e (a) (4), the section embodying the United States Supreme Court test in *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1944) (the *Hope* test), for review of public utility rate-making cases based on claims of unconstitutional confiscation.

In *Hope,* the United States Supreme Court, in interpreting § 4 (a) of the federal Natural Gas Act of 1938; 52 Stat. 821; 15 U.S.C. § 717; concluded that "[u]nder the statutory standard of 'just and reasonable' it is the result reached and not the method employed which is controlling. . . . If the total effect of a rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end." Id., 602. The court went on to state that "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks . . . [and] should be sufficient to assure confidence in the finan-

cial integrity of the enterprise, so as to maintain its credit and to attract capital." Id., 603. Section 16-19e (a) (4), "in identifying the various factors that the DPUC must consider when it establishes rates for public service companies, uses language that tracks, almost verbatim, the language that the United States Supreme Court used in *Hope* . . . ." *CL&P* v. *DPUC,* supra, 635.

Despite the fact that § 16-19e (a) (4) embodies the "just and reasonable" provision of *Hope,* "[n]either the language of § 16-19e (a) (4) itself, nor its legislative history . . . indicates that the section was intended to establish an independent standard, apart from § 4-183 (g), for judicial review of DPUC rate orders." Id. Rather, "under § 4-183 (g) (1) a court must review a claim that a rate order violates § 16-19e (a) (4). Even a rate order that complies with this statutory mandate, however, and establishes a rate of return 'commensurate with returns on investments in other enterprises having corresponding risks'; *Federal Power Commission* v. *Hope Natural Gas Co.,* supra, 603; is not automatically entitled to judicial approval." Id., 638.

Indeed, the incorporation of § 16-19e (a) (4) into § 4-183 (g) requires the trial court to conduct a statutorily circumscribed inquiry, based on the administrative record, into the merits of the administrative decision. Id., 637. "A court may not reverse or modify an agency decision unless it determines that an appellant's 'substantial rights . . . have been prejudiced because the [agency's] findings, inferences, conclusions, or decisions' contravene any one of the section's six specific provisions. General Statutes § 4-183 (g)." Id. The court may not substitute its own balance of regulatory considerations for that of the agency. Id., 638. Its function is "independently [to] assure itself that the DPUC has given 'reasoned consideration' to each of

the guiding factors expressed in § 16-19e (a) (4). See *Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S. Ct. 1344, 20 L. Ed. 2d 312 (1968)." Id.

In reviewing the administrative rate decision, the court must, therefore, "ensure that the agency's decisionmaking process was conducted pursuant to the appropriate procedures and that the outcome of the process reflects reasoned decisionmaking—a reasonable application of relevant statutory provisions and standards to the substantial evidence on the administrative record. Section 4-183 (g) coupled with the presumption of validity that attends a DPUC rate order; *Woodbury Water Co.* v. *Public Utilities Commission,* [174 Conn. 258, 260, 386 A.2d 232 (1978)]; establishes a standard for judicial review that is appropriately deferential to agency decisionmaking, yet goes beyond a mere judicial 'rubber stamping' of an agency's decisions." *CL&P* v. *DPUC,* supra, 637.

Within this context, judicial review of CL&P's action is governed by the UAPA; General Statutes §§ 4-166 through 4-189; and the scope of that review, the "substantial evidence" rule, is restricted. See *Connecticut Building Wrecking Co.,* v. *Carothers,* 218 Conn. 580, 583, 590 A.2d 447 (1991); *Caldor, Inc.* v. *Heslin,* 215 Conn. 590, 598–600, 577 A.2d 1009 (1990), cert. denied, U.S. , 111 S. Ct. 966, 112 L. Ed. 2d 1053 (1991). "Substantial evidence" exists if the administrative record demonstrates " 'a substantial basis of fact from which the fact in issue can be reasonably inferred. . . .' " *Lawrence* v. *Kozlowski,* 171 Conn. 705, 713, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977); see also *CL&P* v. *DPUC,* supra. "With regard to questions of fact, it is neither the function of the trial court nor of this court 'to retry the case or to substitute its judgment for that of the administrative agency.' . . . 'Judicial review of con-

clusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . .' " *Griffin Hospital* v. *Commission on Hospitals & Health Care,* 200 Conn. 489, 496, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986). In the specialized context of a rate case, the court may not substitute its own balance of the regulatory considerations for that of the agency, and must assure itself that the DPUC has given reasoned consideration to the factors expressed in § 16-19e (a) (4). See *CL&P* v. *DPUC,* supra, 638.

Having set forth the proper standard of review, we turn now to the substantive claims of CL&P.

## II

CL&P claims that the DPUC's rejection of its request to exclude from its retail rate base and, thereby, to allocate to its shareholders approximately 10 percent of the revenue from Millstone III's wholesale sales violates constitutional or statutory provisions, exceeds the agency's statutory authority, is clearly erroneous in light of the reliable, probative and substantial evidence on the whole record, and is arbitrary, capricious, and characterized by abuse of discretion or clearly unwarranted exercise of discretion pursuant to § 4-183 (g).[5] We disagree.

---

[5] We note that CL&P has raised numerous challenges to the action taken by the trial court, namely, that the trial court: (1) applied an improper standard of review in examining the decision of the DPUC; (2) improperly found that the $400 million represented utility property; and (3) improperly found, as a matter of law, that the DPUC had not confiscated its private property. Because *CL&P* v. *DPUC,* 216 Conn. 627, 583 A.2d 906 (1990), was decided by this court after the trial court decided this case, that court did not have available to it our determination of the proper standard of review. Although we would ordinarily remand the case for further trial court consideration, in the interest of judicial economy we have decided ourselves to consider the merits of CL&P's claims of law. Id., 639.

This issue has its factual basis in the construction of Millstone III, a nuclear power generating facility. CL&P first proposed constructing Millstone III in 1971 at an estimated cost of $.4 billion. After the construction costs of Millstone III began to escalate dramatically, in 1983 the legislature enacted General Statutes § 16-19t, "capping" at $3.54 billion the costs of construction that CL&P could make part of rate base or otherwise include in the rates approved by the DPUC and charged by CL&P.[6] At this time, the DPUC began a retrospective audit to investigate the prudence of the management and the financing of the construction of Millstone III.

Prior to the completion of the audit, the DPUC, the OCC and CL&P entered into a settlement agreement.[7]

---

[6] General Statutes § 16-19t provides: "EXCESS CONSTRUCTION COSTS OF MILLSTONE 3 NUCLEAR POWER GENERATING FACILITY NOT INCLUDED IN RATES. (a) Construction costs of the Millstone 3 nuclear power generating facility in excess of the sum of the following amounts shall not be made part of the rate base or otherwise included in the rates approved by the department of public utility control and charged by an electric company, as defined in section 16-1:

"(1) Three billion five hundred forty million dollars;

"(2) Any increase in the costs of labor and materials to the extent such increase is due to inflation which exceeds ten per cent per year;

"(3) Any increase in financing costs to the extent such increase is due to an increase in the weighted average rate for the allowance for funds used during construction above nine and one-quarter per cent per year for the years following calendar year 1982;

"(4) Any costs directly attributable to new regulations adopted by the Nuclear Regulatory Commission after March 1, 1983; and

"(5) Any costs due to unforeseeable and unavoidable labor stoppages.

"(b) Nothing in this section shall be construed to limit the department's authority under section 16-19e to review all construction costs of such facility up to the sum of such amounts and to disallow any such costs which are not prudently incurred."

[7] When the settlement agreement was entered into, the interests of the consumers were represented by the OCC's statutory predecessor, the Division of Consumer Counsel. For purposes of this case, we consider the two entities to be the same.

The relevant portions of the settlement agreement, which was drafted by CL&P, provide that: (1) "CL&P's Millstone 3 construction costs . . . to be recognized for retail ratemaking purposes shall be limited to CL&P's retail share of $3.4 billion";[8] and (2) the agreement "does not constitute a finding or admission . . . of any imprudence or inefficiency in the construction of Millstone 3." Upon the completion of Millstone III in 1986, the actual construction costs totaled $3.8 billion, $400 million greater than the total recoverable cost allowed under the settlement agreement.

After the settlement agreement with the DPUC, CL&P applied to the Federal Energy Regulatory Commission (FERC) to establish its rate base for wholesale sales. The FERC alone regulates the cost of wholesale sales by public utilities, without the involvement of the DPUC. The FERC recognized the actual construction cost of $3.8 billion for Millstone III, thereby allowing CL&P to charge its wholesale customers rates for wholesale sales calculated on the basis of a cost of $3.8 billion.

In July, 1988, CL&P filed the application involved in this case with the DPUC to amend its gas and electric rate schedules, and, in particular, to increase its electric rate schedule by $94.4 million. This increase included an accelerated phase-in of allowed construction costs of Millstone III pursuant to the settlement agreement. As part of its proposed schedule, CL&P requested that approximately 10 percent of the revenues derived from wholesale sales of Millstone III be allocated to its shareholders, although all revenues realized from wholesale sales typically are used to bene-

---

[8] General Statutes § 16-19t, which imposed the "cap" of $3.54 billion as the maximum allowable construction costs for Millstone III, recognized that the DPUC had the authority to establish a lower value for allowable construction costs.

fit the ratepayers by reducing allowable ratebase. In support of this requested allocation, CL&P claimed that 10 percent of the revenues from wholesale sales belonged to the shareholders because that percentage represented revenue attributable to that portion of the construction costs that CL&P was required to absorb as a result of the settlement agreement, namely, the disallowed $400 million of the $3.8 billion total construction cost. At the same time, however, CL&P acknowledged that Millstone III, the nuclear generating facility itself, is utility property.

The DPUC, in its decision, disallowed the requested allocation of 10 percent of wholesale sales to the shareholders because: (1) it was inappropriate to provide shareholders with benefits from the sale of specific capacity when CL&P sets its own generation mix; (2) such a result would subvert the intent of both the settlement agreement and the statutory cap of $3.54 billion provided by § 16-19t; and (3) it was inappropriate to trace a particular portion of the sales price of a package of capacity to a particular element of cost for a particular unit.[9] This appeal followed.

---

[9] More specifically, the DPUC held, as grounds for its decision, that "[s]ince the Company can determine the price at which it makes capacity available for sale through its choice of generation mix, the Authority is reluctant to provide shareholder benefits associated with specific capacity sales. Providing an incentive for selling capacity associated with a specific unit(s) (i.e., Millstone 3), would motivate CL&P to adjust the generation mix in order to increase the amount of Millstone 3 sold. Doing so may increase the benefit to shareholders without maximizing total benefits.

"The Authority believes that the implications of the Company's proposal work to subvert the intent of the Settlement Agreement which clearly indicates that ratepayers are to receive all benefits from the operation and/or sale of Millstone 3 in exchange for funding that asset up to CL&P's portion of $3.4 billion. The proposal may similarly work to subvert the intent of the legislated ([§] 16-19t of the Conn. Gen. Stats.) 'cap' amount that also placed a limit on the dollar cost of Millstone 3 that ratepayers would be required to fund. Neither the legislation nor the Settlement contemplated that ratepayers would somehow get less than full benefit because they were

CL&P mounts a three part challenge to the decision of the DPUC: (1) CL&P's share of the $400 million investment in Millstone III that is not recognized for retail rate-making purposes is "nonutility property," and as such the revenue attributable to it, namely, the wholesale sales, must be excluded from CL&P's rate base; (2) the DPUC decision constituted an unconstitutional taking of that nonutility property without just compensation; (3) the DPUC's rejection of CL&P's claim to those revenues was unsupported by the record and was illogical, and was therefore arbitrary, capricious and an abuse of discretion in violation of § 4-183 (g) (5) and (6). All three of these arguments rest, at bottom, on the first challenge, namely, that the wholesale sales that CL&P claims are attributable to the unrecognized $400 million portion of Millstone III's cost are nonutility property, and thus, by virtue of that status or by virtue of principles of fundamental fairness, belong only to the shareholders and not to the rate payers. Thus, CL&P argues, they may not be included in the rate base for retail rate-making purposes. Because we disagree with the fundamental premise of CL&P's argument, we reject its claims.

The determination of whether the $400 million of excess investment supported by CL&P's shareholders constitutes utility property, as claimed by the DPUC, or nonutility property, as claimed by CL&P, is a question of law because the underlying facts are undisputed, leaving only a determination of the legal effect of those facts. Therefore, we review the administrative record to determine " 'whether, in light of the evidence, the [DPUC] has acted unreasonably, arbitrarily, illegally,

---

funding less than 'full' cost. The Authority is also uncertain as to how appropriate it is to trace a particular portion of the market sale price for a package of generation back to a particular element of cost for a particular unit (i.e., the Millstone 3 costs in excess of $3.4 billion)."

or in abuse of its discretion' "; *Griffin Hospital* v. *Commission on Hospitals & Health Care,* supra, 496; or whether, on the contrary, it has given reasoned consideration to the appropriate statutory factors. *CL&P* v. *DPUC,* supra, 638.

It is central to CL&P's claims that the FERC, in contrast to the DPUC, subsequently allowed the entire $3.8 billion cost of Millstone III to be included in CL&P's rate base for wholesale, as opposed to retail, sales. This must be so because, had the FERC followed Connecticut's lead and recognized only $3.4 billion of the cost of construction to be included in the wholesale rate base, the dollar amount of the wholesale rate base and of the retail rate base would have been precisely the same. Under that scenario, CL&P could not argue that the revenues from wholesale sales were attributable to any investment by the shareholders over and above, or different in any way, from that of the ratepayers. Thus, the wholesale sales would not have been attributable or traceable to the unrecognized $400 million investment, because that investment would not have been included in the rate base formula for wholesale sales.

Simply because the FERC permitted a greater portion of the actual costs of construction to be included in rate base for wholesale rate-making purposes, however, does not mean that the wholesale sales revenues attributable to the $400 million must be excluded from the retail rate base. To accept that claim of CL&P would mean in effect that the DPUC in some way was bound to accept, in its retail rate-making determination, the wholesale rate-making determination of the FERC regarding the proper rate base. Nothing in General Statutes §§ 16-19e, 4-183 (g), or in general rate-making principles required the DPUC to do so.

Section § 16-19e (a) (4) and (5) provide in pertinent part: "(a) In the exercise of its powers under the provisions of this title, the department of public utility control shall examine and regulate . . . the establishment of the level and structure of rates in accordance with the following principles . . . (4) that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable; [and] (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation." This broad grant of regulatory authority carries with it the necessarily equally broad discretion, to be exercised within legal limits; see General Statutes § 4-183 (g); to take into account such varying factors as economics, public policies, accounting principles, fairness to the parties, and the context and intent of any prior agreements entered into by the utility, and to balance those factors by a process of reasoned decision-making. See *CL&P* v. *DPUC*, supra, 637. The DPUC is not required, however, to place determinative weight on any single factor.

CL&P argues that the determination of the treatment of the $400 million as utility property was incorrect as a matter of law, pursuant to the following logic. Under the settlement agreement, ratepayers assumed $3.4 billion of the construction costs of Millstone III, leaving CL&P's shareholders responsible for the remaining $400 million. Because of the subsequent decision of the FERC, CL&P is able to charge purchasers of wholesale capacity pursuant to a rate base of $3.8 billion. Nevertheless, under the DPUC's decision all revenues from sales of wholesale capacity are used to

decrease the rate base of retail ratepayers, and do not benefit the shareholders. Therefore, CL&P argues, the additional $400 million included in rate base for wholesale sales must be nonutility property because the shareholders cannot recover that investment from another source and because it is fundamentally unfair for retail ratepayers to have their rate base reduced by the revenue from wholesale sales that are based on a cost of $3.8, not $3.4, billion of Millstone III.

By the settlement agreement among CL&P, the DPUC and OCC, the parties acknowledged that for retail rate-making purposes the construction cost of Millstone III would be limited to $3.4 billion. The unrecognized $400 million did not represent, however, any separate or independent physical portion of Millstone III. It simply amounted to a portion of the overall burden that the shareholders, and not the retail ratepayers, would have to shoulder. The settlement agreement did not transform the unrecognized portion of the cost basis of the entire property, nor the wholesale sales generated by that property, into nonutility property or into an entitlement of the shareholders, simply because the FERC later recognized that portion of the cost for purposes of wholesale rates.

There is no question that the wholesale capacity that Millstone III sells is generated by the entire physical plant, and not by any one portion of it. Nor does the $400 million represent any particular portion of the physical plant. Simply because CL&P may, from an accounting point of view, be able to attribute its wholesale sales revenues to a particular dollar portion of the overall cost of construction, and simply because that dollar portion was subsequently recognized by the FERC as includable in wholesale rate base, does not mean that those revenues are transformed into nonutility property as a matter of law and that the DPUC

therefore was required to exclude them from the retail sales rate base. The electrical power that produces the revenues is generated by the same physical plant that the ratepayers are required to support on the basis of a cost of $3.4 billion.

CL&P's position would require the DPUC to recognize CL&P's accounting principles and would elevate those principles to a requirement of law. Under the circumstances of this case, the DPUC was not required to do so. Its rejection of CL&P's position led to an "outcome . . . [that] reflect[ed] reasoned decisionmaking—a reasonable application of relevant statutory provisions and standards to the substantial evidence on the administrative record." *CL&P* v. *DPUC,* supra, 637. That process did not violate or rebut "the presumption of validity that attends a DPUC rate order . . . ." Id. Thus, the DPUC's reluctance to accept CL&P's accounting principles as a matter of rate-making law, and its uncertainty as to the appropriateness of tracing a particular element of revenue to a particular element of cost; see footnote 9, supra; were likewise the product of the DPUC's reasoned decision-making in the application of § 4-183 (g), and must be sustained by the court.

CL&P next argues that the DPUC's determination that the $400 million of Millstone III construction costs is utility property "flies in the face of the Settlement Agreements." The DPUC claims, however, that the settlement agreement clearly indicates that the ratepayers were to receive the entire Millstone III asset, together with its generating capacity, for financing $3.4 billion of the total construction cost. The interpretation of the intention of the parties to the settlement agreement is a question of fact; *PaineWebber, Inc.* v. *American Arbitration Assn.,* 217 Conn. 182, 190, 585 A.2d 654 (1991); and we review such a determination by an

administrative agency to determine if it is supported by substantial evidence. *CL&P* v. *DPUC,* supra, 639–40. Pursuant to this standard, we conclude that the DPUC's interpretation of the settlement agreement is supported by substantial evidence.

The settlement agreement provides in part that "CL&P's Millstone [III] construction costs . . . to be recognized for retail ratemaking purposes shall be limited to CL&P's retail share of $3.4 billion." CL&P argues that this language means that the $3.4 billion limitation on the recovery of the cost of Millstone III was to be *"only* for purposes of CL&P's *retail* rates" (emphasis in original) and that the agreement "left CL&P free to seek a return on and recovery of its share of the full $3.8 billion invested in Millstone [III] in wholesale rates and charges regulated by the FERC." At the same time, CL&P concedes that "Millstone [III]— the assemblage of steel and concrete at Millstone Point— *is* obviously utility property." (Emphasis in original.)

CL&P interprets the settlement agreement to mean that, when wholesale sales of capacity are made, the limitation on the amount of costs that CL&P can recover pursuant to the settlement agreement is inapplicable because such sales are attributable to the $400 million and, therefore, are nonutility property. The viability of CL&P's interpretation of the settlement agreement is premised, however, on its assertion that the $400 million and the wholesale revenue purportedly attributable thereto have an independent character, apart from the Millstone III plant, that can be separated from "utility property."

A public utility may only recover through rate base those moneys that were spent prudently and reasonably. General Statutes § 16-19e (a) (5) ("the level and structure of rates charged customers shall reflect pru-

dent and efficient management of the franchise operation"). Therefore, there exists a distinction between, on one hand, utility property and, on the other hand, the cost of utility property allowed in rate base, because only that portion of utility property that is the result of prudent and reasonable management is included in rate base. The settlement agreement in issue here was the result of an audit conducted by the DPUC into the prudence of the financing and management of Millstone III after a legislative "cap" had been placed on the recoverable costs of Millstone III by the legislature.[10]

[10] In discussing the proposal for a legislative "cap" on the costs of Millstone III recoverable from ratepayers, codified in General Statutes § 16-19t, Senator John B. Larson stated that "I think what we are talking about here is a question of accountability. The provisions contained in this bill protect both the utility and the customer. I think the history of Millstone 3 is important to the members of the circle. When the plant was originally scheduled the estimated cost of the plant back in 1972 was four hundred million dollars. The current estimate, and this is the estimate of Northeast Utilities, is three point five four billion dollars. That's an increase, Mr. President, of nine hundred percent. It is this increase, I think, that has led to a calling for accountability on the part of the Committee for this specific piece of legislation. . . . It has the provision within the bill to safeguard the utility but it also holds the utility accountable to its projections." 26 S. Proc., Pt. 5, 1983 Sess., pp. 1764–65.

In the House of Representatives, Representative David Lavine stated that "when Northeast Utilities started in the early '70's to construct Millstone III they gave as the cost of the plant $400 million at the time of its completion.

"Over the years, that cost estimate has risen and risen again and risen again. Today the cost of that plant was set by Northeast Utilities as $3.55 Billion. That makes it one of the most expensive structures in the United States. Ladies and gentleman, last year, just about this time, we had a bill before the Energy and Public Utilities Committee which would have set forth a study to see whether this plant was cost effective.

"Mr. Speaker, Northeast Utilities came before the Committee at that time and gave the cost of the plant as $2.6 billion. Six months later when they went for a rate case the cost of the plant had risen $900 million. Mr. Speaker, you and I and the people who get electricity from Northeast Utilities are going to have to pay the cost of this plant and what we want to say today is that the cost of the plant at $3.54 billion is enough.

"Northeast Utilities has testified before the Department of Public Utility Control and testified before our committee that they are sure that this

CL&P was aware that the DPUC could have concluded that a much larger portion of the $3.8 billion spent on constructing the plant, 900 percent over estimated costs, was incurred imprudently. CL&P therefore chose to enter into an agreement whereby ratepayers "purchased" Millstone III in its entirety for $3.4 billion.[11] The agreement proposed and drafted by CL&P represents an accounting disallowance of costs to be recovered.

The effect of this accounting disallowance was that the ratepayers "paid" $3.4 billion to "own" Millstone III; see footnote 11, the utility itself and the power it generates. CL&P claims, however, that the portion of wholesale sales attributable to the $400 million paid by shareholders is nonutility property.[12] CL&P argues that to conclude otherwise is to contravene "well-settled principles governing gain on the sale of nonutility property."

CL&P, while conceding that "little authority exists dealing with the precise fact situation presented in this case," relies on a line of authority where "the gains on the sale of the utility company land that was never included in rate base and therefore never supported

is going to be sufficient funds to construct the plant. Mr. Speaker, I say it is time to take them at their word. Let us tell them that this is the cost of the plant and let us hold them to that figure.

"It is nothing more than what we would require of any business in the State of Connecticut, and ladies and gentlemen, if there was a business that had gone up 900% in its estimation and capital construction, I doubt very much it would still be in business unless they had what Northeast [Utilities] has, which is a cost plus and you pay the interest." 26 H.R. Proc., Pt. 6, 1983 Sess., pp. 2323–25.

[11] By "purchase," we mean that only $3.4 billion of the cost of the plant would be included in the rate base that would ultimately determine the retail rates to be paid by the ratepayers.

[12] CL&P's concession that only the "steel and concrete" are utility assets ignores that such steel and concrete only have value insofar as they work to generate capacity. Ratepayers did not "pay" $3.4 billion solely for the independent material elements that went into the construction.

by ratepayers" belong to the shareholders. See, e.g., *Washington Public Interest Organization* v. *Public Service Commission,* 446 A.2d 28, 30–31 (D.C. App. 1982); *Boise Water Corporation* v. *Public Utilities Commission,* 99 Idaho 158, 161–62, 578 P.2d 1089, 1092–93 (1978); *Lexington* v. *Lexington Water Co.,* 458 S.W.2d 778, 779 (Ky. App. 1970); *Maine Water Co.* v. *Public Utilities Commission,* 482 A.2d 443, 448 (Me. 1984). The premise underlying these cases is that "the right to capital gains on utility assets is tied to the risk of capital losses" and that one "who bears the financial burden of particular utility activity should also reap the benefit resulting therefrom." *Democratic Central Committee of District Columbia* v. *Washington Metropolitan Area Transit Commission,* 485 F.2d 786, 806 (D.C. Cir. 1973), cert. denied, 415 U.S. 935, 94 S. Ct. 1451, 39 L. Ed. 2d 493 (1974). Despite the validity of these principles, we find these cases distinguishable from the case before us.

In the cited cases, the shareholders of the utility purchased the asset without contribution by the ratepayers. Because those assets had an independent, private quality of ownership peculiar to the shareholders, it was proper for the gain on the sale of the asset to benefit the shareholders because they bore the risk of capital loss. See *Maine Water Co.* v. *Public Utilities Commission,* supra, 448. In this instance, however, the shareholders did not purchase the disputed $400 million portion of Millstone III privately, or independently bear the burden of the risk of loss. In fact, in contrast to these cases, CL&P concedes in this case that the plant itself is utility, and, therefore, ratepayer property.

CL&P seeks to dissect analytically the "utility property" quality of the generating plant from the actual manner in which the plant was financed. This argument

confuses scenarios where (1) shareholders purchased a separate asset privately without reimbursement from the ratepayers, thereby bearing all of the associated risks, and (2) a *portion* of the entire cost of a utility asset must be carried by the shareholders because of an agreement settling a claim by the regulatory authority of imprudence and inefficiency in the construction of that asset.[13] Unlike the cases upon which CL&P relies, the $400 million in this case has no independent quality attributable only to the shareholders. Rather, the $400 million inextricably is related to the utility property itself and, standing alone, has no value apart from Millstone III.

Furthermore, as noted by the trial court, CL&P itself defines nonutility property "as 'other investments made by a utility that are, for example, (1) unrelated to its regulated utility business or are abandoned; (2) under construction; (3) excess capacity that is not necessary to meet its customers' requirements; or (4) property held for future use.' " The $400 million of costs incurred by the shareholders in exchange for a $3.4 billion burden borne by ratepayers does not fit into any of CL&P's own delineated definitions of "nonutility property." Nor, therefore, do the revenues that CL&P claims are attributable to that sum of money.

By entering into the settlement agreement, CL&P negotiated away its right to recover the full construction costs incurred in the building of Millstone III in exchange for the termination of the DPUC's impru-

---

[13] Despite the language in the settlement agreement that it did not constitute "a finding or admission . . . of any imprudence or inefficiency in the construction of Millstone [III]"; it is beyond dispute that by this settlement CL&P was avoiding a potential finding by the DPUC in an ongoing imprudence audit of an even greater disallowance of cost of construction. In referring to the intent of the agreement, the DPUC was not required to disregard the circumstances surrounding it.

dence audit.[14] Pursuant to this agreement, ratepayers supported $3.4 billion to purchase the entire generating facility, and CL&P does not dispute this. It was not unreasonable for the DPUC to interpret the intent of the agreement to encompass the entire generating capacity of Millstone III as utility property. CL&P has proffered no persuasive reasoning otherwise. It is irrelevant to this determination that CL&P persuaded the FERC to set $3.8 billion as the total construction costs for wholesale rate base. It is also irrelevant that sales from wholesale capacity are based on this higher cost figure and are used to reduce retail rate base. The fact that the ratepayers purchased Millstone III at a settled price does not alter the character of the generation sold from being that of utility property.

We conclude, based on the foregoing, that CL&P's claim that the DPUC deprived it of nonutility property is incorrect, and that its shareholders are not entitled to recover 10 percent of the revenues derived from the sale of wholesale and capacity sales. Furthermore, the DPUC's decision did not confiscate any of CL&P's property, and it was not unreasonable, arbitrary, illegal or an abuse of discretion pursuant to § 4-183 (g) (1) (2) (4) (5).

III

CL&P next claims that the DPUC's inconsistent treatment of its electric deferred fuel balance (DFB) was arbitrary, capricious and unsupported by evidence in the record, in violation of § 4-183 (g). CL&P also argues, aside from the merits of the DPUC's decision, that the DPUC failed adequately to state its reasons for the disparate treatment of these items, in violation of General Statutes § 16-9[15] and *Connecticut Natural*

---

[14] The agreement specifically provided that "[p]roceedings in Docket No. 83-07-03 for Phase I and Phase II of Millstone [III] prudence shall be terminated without findings."

[15] General Statutes § 16-9 provides: "All decisions, orders and authorizations of the department of public utility control shall be in writing and

*Gas Corporation* v. *PUCA,* 183 Conn. 128, 144–45, 439 A.2d 282 (1981) (the DPUC must explain its decision so that a court may review its action). We disagree with both of these claims.

In general terms, the DFBs at issue here—the gas DFB and the electric DFB—arose out of a process of deferred fuel accounting that the DPUC permitted CL&P to employ during the early 1980s. As defined by CL&P, a deferred fuel balance is "[a] bookkeeping account that records the difference between actual fuel or purchased gas costs incurred by a utility to provide service and the amounts currently recovered through rates for those costs." That difference, either positive or negative,[16] is accumulated in an account, known as a deferred fuel balance. Thus, a DFB is the result of deferred fuel accounting, a method that was intended better to match the revenue derived from fossil fuel sales with their respective costs. The purpose of this method was to accumulate in the particular DFB, for future collection, the differences between revenues and costs.

CL&P's claim of inconsistent treatment involves a consideration of four accounting entries reflected on

shall specify the reasons therefor, shall be filed and kept in the office of the department and recorded in a book kept by it for that purpose and shall be public records. Said department may, at any time, for cause shown, upon hearing had after notice to all parties in interest, rescind, reverse or alter any decision, order or authorization by it made. Written notice of all orders, decisions or authorizations issued by the department shall be given to the company or person affected thereby, by personal service upon such company or person or by registered or certified mail, as the department determines."

[16] The balance is negative when the fuel related revenues collected by the utility exceed the costs, thus representing an overpayment by the ratepayers. The balance is positive when the fuel related revenues collected by the utility are less than the costs, thus representing an advance by the company.

its books: (1) certain reserves; (2) certain prepayments; (3) the gas DFB; and (4) the electric DFB. The DPUC included the first three elements in the rate base, but excluded the fourth. CL&P argues that "[c]onsistency of treatment requires that [its] electric and gas DFBs and its outstanding balances of prepayments and reserves all be included in, or excluded from, rate base." This argument rests on the assertion that "there is absolutely no logical or practical distinction between the treatment of [its] electric DFB, on the one hand, and the treatment of [its] gas DFB and its outstanding balances of prepayments and reserves, on the other . . . ."

Consideration of CL&P's argument requires some explanation of the particular accounting elements at issue. The reserves account is comprised of a balance of a "bad debt reserve" in the total amount of $7.984 million, a total "injuries damage reserve" of $1.909 million, and a total "group medical reserve" of $2.117 million, for a total reserves account of $12.01 million. The DPUC specifically found "that these reserves represent ratepayer- provided capital and result from prior charges to expenses greater than the actual cost incurred."

Although the precise nature of the "prepayments" is not delineated in either the DPUC's decision or in the briefs in this court, they total $5.781 million, and the DPUC agreed with CL&P that they are "similar to the reserves, but on the opposite side of the balance sheet." The DPUC also agreed with CL&P that "it is appropriate to apply consistent rate base treatment for prepayments and reserves, with both items included as specific line items or both items excluded from the overall rate base calculation." Thus, the DPUC included both the reserves and prepayments in the rate base,

resulting in a net reduction of the rate base of $6.229 million,[17] constituting $12.01 million less $5.781 million.

This decision of the DPUC demonstrates a straight-forward application of accrual accounting principles, reflecting the undisputed economic reality that, regarding the reserves, CL&P had in the past overestimated certain expense items to the detriment of the ratepayers and thus was required to "repay" them by reflecting that excess in rate base. Also, with regard to the prepayments, CL&P had made certain payments in advance to the benefit of the ratepayers and thus was entitled to "recoup" them by including those prepayments in rate base. This does not mean, however, that, as CL&P's argument assumes, the deferred fuel balances must be treated in the same manner as the reserves and prepayments. Simply because different items may, for accrual accounting purposes, be treated the same on a utility's books does not mandate that they be entitled, as a matter of law, to the same treatment for rate base purposes, where they reflect different economic realities and play a different role in the rate-making process. Consistency of accounting treatment does not necessarily require consistency of rate-making treatment, and, indeed, CL&P cites no authority for such a proposition. Since CL&P offers no justification for excluding the reserves and prepayments from the rate base other than accounting consistency, and does not address in any other way their underlying economic realities or roles in the rate-making process, we conclude that the DPUC's decision to include them must stand.

We turn, therefore, to the DFBs. In its 1985 and 1987 rate cases, CL&P had proposed that both the electric

---

[17] CL&P asserts in its brief that the total is "approximately $7.7 million." Our reference to the pages of the record cited by CL&P for this figure results in the net of $6.229 million. The difference in arithmetic, however, does not affect the application of the principle.

and gas DFBs be included in the rate base. In both of those decisions, however, the DPUC included the gas DFB, along with the reserves and prepayments, and excluded the electric DFB. In this case, CL&P proposed that neither of the DFB balances be included in the rate base. The DPUC, however, adhering to its prior treatment, excluded the electric DFB and included the gas DFB.

In its decision, the DPUC stated that: "The Authority previously has determined that the existing electric deferred fuel balance, which the Company refers to in its written comments [on the DPUC's draft decision], should not be allowed in rate base (see Decisions in Docket No. 85-10-22 . . . and Docket No. 87-07-01 . . .). The Authority finds no reason in this case to change our position. As to the Company's position on prepayments and reserves in the rate base, these items are addressed in Section IV, C, 4, supra. Other than these arguments, the Company offered no other reasons why the gas deferred fuel balance should be excluded from rate base. Therefore, the Authority still considers it appropriate to include in the rate base the gas deferred fuel balance in the credit amount of $3,620,000."

In this case, the gas DFB is a negative $3.62 million, and the electric DFB[18] is a positive $43.4 million. In

[18] In fact, there are two electric DFBs presently existing. The one at issue in this case is the result of the accumulation from 1983 through 1985, when the DPUC discontinued the deferred fuel accounting procedure. At that time the electric DFB amounted to $84 million and, in accordance with the 1985 rate decision it was to be amortized against revenues, with no rate base treatment, over a period of ten years. The second DFB covers the period from 1986 through 1987, and the parties agreed in a supplement to the settlement agreement that its amount would be $30 million, and that it also would be amortized against revenues, with no rate base treatment, over a period of ten years. Since CL&P is recovering over a period of ten years the amount of the $43.4 million electric DFB, its claim to have the

order to understand CL&P's claim, a review of the history of the electric DFB is necessary, and is significant to its treatment by the DPUC.

As the DPUC explained in its 1985 decision, the original purpose of the deferred accounting method, introduced in the 1981 rate decision and carried into the 1982 and 1983 decisions, was "to provide a better matching of fossil fuel revenues with fossil fuel costs. This mechanism was one of a number of adjustments that the Company received in response to the problems electric utilities were facing in the late 1970s and early 1980s. These problems included: rapid energy price increases and fluctuations, high capital costs, sluggish sales, higher than anticipated operating costs, and generally high inflation, all of which impaired the Company's ability to recover its costs, including fossil fuel."

The DPUC also recognized in 1985, however, that, because there had been no corresponding adjustment to revenues, "this accounting mechanism improved the Company's ability to achieve its allowed return on equity when incremental non-fuel costs were more than offset by revenues from additional sales. The problem that has become apparent since 1983 is that under the deferred fuel mechanism it is possible that fuel costs will be deferred for future collection during a period when the Company is earning well above its authorized return on equity, so that the use of deferred fuel accounting enhances the Company's profits. This effect specifically occurs when revenues from base rates due to increased sales during the rate year more than offset increases in non-fuel costs. As observed during these hearings, the Company, under such conditions, overcollects total costs. The buildup of a substantial bal-

balance also included in rate base is a claim that it is entitled to a return on that balance—to the time value of those funds, in addition to their ultimate recovery through amortization as an expense against revenues.

ance in the deferred fuel account has also been aided by a changed economic environment, characterized by declining fuel prices, lower interest rates, and low inflation, which have also contributed to the Company's increased profitability."

The DPUC concluded: "In the Authority's judgment, a deferred fuel account which allows the Company an opportunity to capture the increased revenue associated with increased sales, yet which defers a major component of increased costs associated with those sales, is not appropriate ratemaking under economic conditions which prevail today. Only through a projected volume adjustment for sales might a recovery of deferred fuel expenses be justified. In the absence of such an adjustment, and for the reasons cited above, it is the Authority's belief that accounting for fuel costs on a deferred basis is no longer warranted or justified." Thus, the electric DFB is an account, purporting to represent money owed by the ratepayers to the shareholders, that in fact was the result of the application of an accounting method that had outlived its usefulness. The risks that it had shifted to the ratepayers—particularly the risk of flat sales—had largely disappeared while the accounting method continued to be applied as if those risks still existed.

In 1984, the DPUC began a proceeding to investigate the 1983 rate order on the grounds that CL&P's earnings were excessive due to a sharp rise in the electric DFB. *Connecticut Light & Power Co.* v. *Department of Public Utility Control,* 40 Conn. Sup. 520, 522–23, 516 A.2d 888 (1986). In that 1984 hearing, the DPUC suspended the electric deferred fuel accounting method and determined that the balance would be amortized over ten years as an expense against revenues. In an appeal from the interim orders of the DPUC suspending the deferred fuel accounting method, the Superior

Court acknowledged the reasons for the extraordinary growth in CL&P's electric DFB: "In its March, 1985 hearings the DPUC observed that the financial indicators for CL&P were much better than had been forecasted when the rates were set in 1983, due to a stronger economy, lower inflation and more favorable financing conditions. The primary reason for the company's high earnings, however, was sales growth at a rate exceeding cost increases. This sales growth had two effects on the company's financial situation: first, it increased CL&P's [return on equity], as of the twelve months ending February, 1985, to 19.8 percent; second, simultaneously, it increased the deferred fuel balance to $84 million." Id., 524.

In the 1985 rate decision, the DPUC agreed with its prosecutorial division "that CL&P be allowed to recover the deferred fuel balance over ten years, without rate base treatment . . . ." The rationale of the 1985 decision was that, although the previous "decision to authorize deferred fuel accounting was justified under the unique conditions in the late 70s and early 80s, including a high rate of inflation, low load growth and a major construction program . . . changed circumstances caused later results that turned out to be less than optimum." Those "changed circumstances" and "less than optimum" results are precisely those specified by the DPUC in its reasoning for discontinuing the deferred fuel accounting method.

This history of the rise and demise of the deferred fuel balance accounting method, and of its corresponding result, namely the electric DFB, supplies an administrative record of reasoned decision-making that justifies the DPUC's decision to exclude the electric DFB in this case. Since the economic conditions that gave birth to the method no longer obtained, and since a primary reason for the large balance in that account

was increased sales at a rate exceeding cost increases, and thus increased profits—results that were not anticipated when the method was instituted—it was within the administrative discretion of the DPUC to confine CL&P's recovery of that balance solely through its amortization as an expense against revenues, and not also as part of the rate base. Thus, we agree with the DPUC that both the method and its results were no longer justified "because of a fundamental change in the circumstances that created [the method] and because of an internal flaw in the methodology itself" that resulted in an unanticipated high balance from those changed circumstances and that flawed methodology.

This same history does not apply, however, to the gas DFB. We agree with the DPUC that the only reason offered by CL&P that the gas DFB should not be included in rate base if the electric DFB is not is that of consistency: it should be treated the same as the electric DFB because it is the same type of account from an accounting point of view. Contrary to CL&P's position, however, we conclude that, in the absence of a history similar to that of the electric DFB, or some other persuasive reason justifying its exclusion from the rate base, the DPUC was within its discretion in treating the gas DFB as a form of recovery, through the rate base, of the excessive expense collected by CL&P that it represented.

This discussion also disposes of CL&P's argument that the DPUC inadequately specified the reasons for its decision. We reject the contention of CL&P that an agency may not provide support for its determination by incorporating by reference the rationale it employed in its previous decision. CL&P has provided no reason or policy for such a prohibition, nor do we perceive any. The 1985 decision, incorporated by reference in the

decision at issue in this case, adequately stated the DPUC's reasons, and the factual basis therefor. Neither § 16-9 nor *Connecticut Natural Gas Corporation* v. *Public Utilities Control Authority*, 183 Conn. 128, 144–45, 439 A.2d 282 (1981), requires more.

The judgment is affirmed.

In this opinion the other justices concurred.