[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs, a minor child and his mother and guardian, appeal a decision of the Adoption Subsidy Review Board denying them an adoption subsidy. The appeal is brought pursuant to the Uniform Administrative Procedures Act (UAPA), General Statutes §§ 4-166, et seq., specifically General Statutes § 4-183.
The plaintiffs seek to challenge the decision, which they alleged was influenced by a policy of denying subsidized adoptions to alien children, on constitutional due process of law and equal protection grounds. The court is unable to reach such claims in that the record contains substantial evidence that the plaintiff child did not meet the adoption subsidy prerequisite status of a "special needs child."[1]
Connecticut has enacted an adoption subsidy program that in large part is federally funded and regulated. 42 U.S.C. § 673. The purpose of the legislation is evident by its initial limitation of such subsidies to "hard-to-place" children. Public Acts 1986, No. 86-330, § 2 (rewriting General Statutes §17a-116 to substitute "special needs" for "hard-to-place"). The purpose was and is clearly to assist in moving children from foster care to adoptive homes.
Connecticut also allows post adoption subsidies, General Statutes § 17a-117 (b), which is at issue in this case.
The facts of this case as found by the Adoption Subsidy Review Board are as follows.[2]
CT Page 13616
 1. Jonathan Genn was born in Calcutta, India, on December 24, 1981, and abandoned by his mother. At birth, Jonathan was 10-12 weeks premature and weighed approximately three pounds.
 2. I.M.H., an agency in India, provided care for Jonathan and worked as a liaison with Crossroads, an adoption agency in Minnesota, to facilitate Jonathan's adoption by Ms. Genn.
 3. On November 25, 1980, Ms. Genn signed a Declaration, stating her intent to take guardianship of an Indian child for prospective adoption, declaring her employment and salary (Exhibit #35a). Ms. Genn also signed a Power of Attorney, Bond, Affidavit, and Guardianship agreement.
 4. In May of 1981, I.M.H. files, previously assigned to Crossroads, were to be transferred to A.I.A.A., a child-placing agency in Michigan. Ms. Genn requested that her file be transferred to A.I.A.A.
 5. J.F.S. was enlisted by A.I.A.A. to prepare and update the home study. A.I.A.A. reviewed and approved all home studies and supervision reports (Exhibit #36d). On June 1, 1981, A.I.A.A. requested an up-dated home study from J.F.S., as Jonathan's visa would not be approved without a current home study. On June 15, 1981, J.F.S. completed the updated home study.
 6. A.I.A.A. continued to provide to Ms. Genn general informational letters regarding the status of available children and of the medical status of the children. A.I.A.A. advised that they "cannot guarantee the health or the potential of any child".
 7. On December 7, 1981, J.F.S. sent an updated home study to I.N.S., on Ms. Genn's behalf.
8. On January 20, 1982, the court in India CT Page 13617 appointed Ms. Genn as guardian of Jonathan Ein (Exhibit #39).
 9. On January 20, 1982, A.I.A.A. sent to J.F.S. a birth certificate and petition to make Ms. Genn the guardian of Jonathan. A.I.A.A. instructed J.F.S. on how they should proceed with the visa approval process (Exhibit #37c).
 10. On February 2, 1982, A.I.A.A. sent J.F.S. the guardianship decree which named Ms. Genn as guardian of Jonathan Ein.
 11. On March 2, 1982, Jonathan arrived in the United States and was picked up by Ms. Genn at the airport. On March 3, 1982, A.I.A.A. informed J.F.S. of Jonathan's placement with Ms. Genn and instructed J.F.S. as to the supervision reports which would be needed.
 12. On March 30, 1982, J.F.S. provided A.I.A.A. with the first of three supervision reports for Ms. Genn. On May 25, 1982, J.F.S. provided A.I.A.A. with the second supervision report. On September 3, 1982, J.F.S. provided the third and final supervision report to A.I.A.A. All reports indicated that Jonathan was doing extremely well and making progress (Exhibits #40a-40d).
 13. On October 7, 1982, Ms. Genn applied to the probate court to request that J.F.S. be named as statutory parent (Exhibit #42a). On October 8, 1982, an Affidavit was filed by J.F.S., confirming that Ms. Genn received legal guardianship of Jonathan in India (Exhibit #41).
 14. On December 10, 1982, J.F.S. was appointed by the probate court as statutory parent of Jonathan (Exhibit #42b). Also on December 10, 1982, an Agreement of Adoption, naming Ms. Genn as the adopting parent, was filed in probate court (Exhibit #42c). Throughout, Jonathan remained in the custody of Ms. Genn.
CT Page 13618
 15. On February 14, 1983, Jonathan's adoption by Ms. Genn was finalized (Exhibit #43).
 16. On February 14, 1995, a Medical Statement by Gary R. Wanerka, M.D., was prepared (Exhibit #50). The statement indicates that Jonathan has had many significant medical problems, including recurrent respiratory infections, asthma, heights and weights consistently below the third percentile, attention deficit disorder and learning disabilities. Dr. Wanerka attributed these problems to Jonathan's genetics and circumstances of birth.
 17. On March 21, 1995, a report by Thomas E. Brown, Ph.D., was prepared on behalf of Jonathan Genn (Exhibit #9). The report indicates that Jonathan "is a strongly motivated student with high average verbal skills and superior abilities to learn new material in visual, verbal and auditory modalities. Yet the test results also demonstrate a pattern of cognitive impulsivity, excessive distractibility and relatively impaired verbal memory which have limited Jonathan's academic achievement, producing a performance which ranges from well-above grade level on some verbal tasks to several years below grade level on spelling/grammar and two years below on math concepts." The report states that the pattern of Jonathan's impairments are consistent with the diagnosis of attention deficit disorder without hyperactivity.
 18. Jonathan Genn has not been deemed a special education student by the New Haven Public School System.
 19. On May 30, 1995, Jonathan was determined SSI eligible, retroactive to January 23, 1995 (Exhibit #4).
CT Page 13619
"Special needs" child is defined in § 17a-116.[3] The definition expresses the purpose of the statutory scheme of encouraging the adoption of hard-to-place children.[4]
Section 17a-117 limits adoption subsidies to special needs children adoptions.
The child Jonathan for whom the subsidy is sought has never been a ward of the Commissioner of the Department of Children and Families (DCF). His adoptive mother was appointed his guardian while he was still in India prior to his emigration to this country. Jonathan was placed with his mother by the Indian court. He was picked up by his mother at the airport and remained in her care.
Plaintiffs cite the alternate special needs ground of §17a-116 for children placed by a licensed child-placing agency and who are difficult to place in adoption because of one of the enumerated conditions. The defendant correctly notes that the agencies that placed the child, I.M.H. and A.I.A.A. were not Connecticut licensed child-placing agencies. In fact it appears that J.F.S. (Jewish Family Services) was used for purposes of the home study and facilitation of the adoption, because it was a licensed child-placing agency. However, under these facts, the placement of the child with his adoptive mother was undertaken by I.M.H., A.I.A.A. and the Indian court.
Jonathan also was not a child difficult to place. Jonathan was born on December 24, 1981, and was physically in his pre-adoptive home on March 2, 1982, within 10 weeks of his birth. Jonathan was brought to this country specifically for adoption by Ms. Genn.
The application for adoption subsidy in this case came 15 years after the adoption.[5] DCF was unable to ascertain whether the child could have been returned to his parents in India. See 42 U.S.C. § 673 requiring the state to determine if the child could or should be returned to his biological parents. The state was also obligated to determine if the child could be placed with adoptive parents without adoption assistance.
The record also contains evidence that Jonathan was not a special needs child at the time of the adoption. (R. Exhibits 40c and 40d.) Certainly his conditions which qualify him for Social CT Page 13620 Security Supplemental Security Income (SSI) are substantial; however, Exhibit #9 reflects a high average IQ and good academic achievement.
A basic principle of administrative law is that the scope of the court's review of an agency's decision is very limited. General Statutes § 4-183 (j) provides that "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." In order to obtain reversal of an agency's decision, the plaintiffs must demonstrate that he suffered "material prejudice as a result of this alleged procedural deficiency." Jutkowitz v. Departmentof Health Services, 220 Conn. 86, 94 (1991).
Furthermore, "Judicial review of conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion." Conn. Light Power Co. v. Dept. of Public UtilityControl, 219 Conn. 51, 57-58 (1991). Similarly, "[w]ith regard to questions of fact, it is [not] the function of the trial court . . . to retry the case or to substitute its judgment for that of the administrative agency." Id., 57. "The question is not whether the trial court would have reached the same conclusion but whether the record before the commission supports the action taken." Hospital of St. Raphael v. Commission on Hospitals Health Care, 182 Conn. 314, 318 (1980).
"Judicial review of [an administrative agency's] action is governed by the Uniform Administrative Procedure Act, and the scope of that review is very restricted . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the [administrative agency] . . . The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of [its] discretion." (Citations and internal quotation marks omitted.) Board of Education v. Freedomof Information Commission, 208 Conn. 442, 452 (1988).
Nevertheless, where "the issue is one of law, the court has CT Page 13621 the broader responsibility of determining whether the administrative action resulted from an incorrect application of the law to the facts found or could not reasonably or logically have followed from such facts. Although the court may not substitute its own conclusions for those of the administrative board, it retains the ultimate obligation to determine whether the administrative action was unreasonable, arbitrary, illegal or an abuse of discretion." United Parcel Service, Inc. v.Administrator, Unemployment Compensation Act, 209 Conn. 381, 385
(1988).
The plaintiffs' appeal is from a discretionary decision. Section 17a-117 (b) provides for post adoption subsidies "at the discretion of the [DCF] commissioner." The standard of judicial review requires that "an agency's factual and discretionary determinations are to be accorded considerable weight by the courts." Connecticut Hospital Assn. v. Commission on Hospitalsand Health Care, 200 Conn. 133, 140 (1986); Board of Alderman v.Bridgeport Community Television Co., 168 Conn. 294, 298-99
(1975). State Medical Society v. Board of Examiners in Podiatry,208 Conn. 709, 717 (1988).
The appeal is dismissed.
Robert F. McWeeny, J.