[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff is a special school district established within the department of correction pursuant to General Statutes §18-99a. It appeals a decision of the state department of education holding the plaintiff liable to provide educational services to defendant Rafael[1], a child requiring special education, for a period during which Rafael had been in the custody of the department of correction as a pretrial detainee. The defendant department of education rendered its decision, which contained a number of other orders, pursuant to General Statutes § 10-76h. The plaintiff's appeal is authorized by subsection (d)(4) of that statute and by § 4-183. The court finds in favor of the plaintiff.
Certain essential facts are not in dispute and provide the framework for the court's decision. Defendant Rafael is nineteen years old and suffers from profound learning disability and emotional and social maladjustment. At all relevant times, Rafael CT Page 5252-OOOO has been a child requiring special education within the meaning of General Statutes § 10-76a et seq. and a child with disabilities within the meaning of the federal Individuals with Disabilities Act (IDEA), 20 U.S.C. § 1400 et seq.
Rafael and his mother are residents of Meriden, and Rafael entered the public school system there in 1986. The Meriden board of education identified Rafael as child requiring special education and placed him in an appropriate program commencing in 1986.
Rafael and his mother left Meriden for Puerto Rico in 1990 and returned to Meriden in 1992. At that time, Meriden officials determined that he was in need of treatment and education in a residential program, but Rafael refused to remain in the program provided for him.
On May 10, 1993, the police arrested Rafael on various felony charges and the court ordered him to be held in jail, in the custody of the department of correction, unless and until he posted the required bond. Rafael remained in custody until January 14, 1994, when he posted bond, a period of eight months. During this period of incarceration, the department did not offer Rafael an individualized special education program nor did he attend any special education classes. During this period, Rafael was transferred between the New Haven and Hartford Community Correction facilities a total of twenty-seven times in order to meet his court appearance commitments in the New Haven and Hartford courts.
Upon his release from prison, the Meriden board of education resumed control of Rafael's special education program. This program was interrupted, however, on July 5, 1994, when Rafael was arrested on new felony charges. This time he remained in custody until January 20, 1995.
In August 1994, while Rafael was in custody as a pre-trial detainee for the second time, the Meriden board of education's planning and placement team (PPT) met and developed an individual educational plan (IEP) for Rafael that prescribed a residential special education program for him upon his release from custody.
During this second period of pre-trial detention, Rafael was transferred between correctional institutions eighteen times. Also, twice during this period, Rafael signed statements that he CT Page 5252-PPPP did not want to attend school. Nevertheless, during that period, on October 20, 1994, Rafael's mother wrote the defendant department of education requesting a hearing in accordance with § 10-76h to review Rafael's special education needs.
In November 1994, the plaintiff school district commenced a special education program for Rafael while he was in the custody of the department of correction. Although it had conducted some testing, the plaintiff did not convene a PPT meeting. The plaintiff's attempt to do so in December 1994 was aborted because of the illness of the school district principal and the unavailability of Rafael. There was no other meeting. Without a PPT meeting, the plaintiff could not and did not develop a new IEP or modify the most recent Meriden IEP. Rafael was enrolled in the plaintiff's school system in November 1994, however, and attended some classes. Evidence in the administrative record discloses that he attended classes on six out of a possible forty-six school days. There were several reasons for this plainly dismal record, including court appearances, transferring between facilities, and Rafael's own recalcitrance.
On January 20, 1995, all of the charges against him were finally resolved and Rafael was placed on probation. A condition of his probation was that he enter a residential treatment and education program operated by the Brown and Sullivan School in Suffield. He is presently still a resident of that program.
During the course of the administrative hearing before the defendant state board of education, while Rafael was enrolled as a resident at Brown and Sullivan, the Meriden board agreed to pay for Rafael's special education services at that school until June 30, 1997, when he will have attained age 21 and will no longer be eligible for such services under applicable statutes.
On March 7, 1995, following the hearing and following Rafael's release from custody, the hearing officer rendered her final decision. The hearing officer identified the principal issue for decision to be whether plaintiff Unified School District #1 is liable to Rafael for special education services to compensate him for the denial of any such services that were due him during the periods when he was in the custody of the department of correction as a pre-trial detainee. The hearing officer held that the plaintiff is liable for compensatory special education services and that such services must be rendered by the Brown and Sullivan school. Those issues are now CT Page 5252-QQQQ before this court.
In her decision, the hearing officer set forth detailed findings of fact and conclusions of law, which may be summarized as follows:
 1. During the eight months of Rafael's first period of incarceration, the plaintiff school district failed to identify Rafael as a child in need of special education.
 2. During that period, the plaintiff school district failed to hold a PPT meeting and develop an IEP for Rafael.
 3. During that period, the plaintiff school district failed to offer Rafael any educational services.
 4. During Rafael's second period of incarceration, the plaintiff school district failed to hold a PPT meeting concerning his special education needs.
 5. During that second period of incarceration, the plaintiff school district failed to develop an IEP or modify Meriden's existing IEP to accommodate Rafael's current circumstances.
 6. The special education program that the plaintiff school system did implement for Rafael did not comply with state law requiring minimum school hours per day.
 7. Federal and state statutes and regulations required the plaintiff school district to convene a PPT meeting and develop and implement an IEP for Rafael at the beginning of each of his periods of incarceration.
 8. The Brown and Sullivan school was, as of the date of the hearing officer's decision, providing an appropriate special education program for Rafael. CT Page 5252-RRRR
Based on the findings of fact and conclusions of law summarized above, the hearing officer further concluded that the plaintiff school district is liable to Rafael for ten and one-half months of educational services to compensate him for the services that it failed to provide him during the entire first period of his incarceration and during the last two and one-half months of his second period of incarceration.
The hearing officer ordered that the plaintiff school district provide the compensatory education at the Brown and Sullivan school or at a comparable residential facility. The parties concede that this order means that the plaintiff school district is held liable for the full cost of the plaintiff's placement at Brown and Sullivan for ten and one-half months beginning July 1, 1997, when the obligation of the Meriden board of education will expire. At that time, Rafael will have attained age twenty-one.
Based on her findings and conclusions, the hearing officer also issued supplementary orders requiring that the plaintiff school district (1) hire someone to fill the vacant position in the district to be responsible for administering its special education program; (2) establish a "data collection system" to record when pre-trial detainees are offered educational services; (3) develop a procedure to transfer a scheduled PPT meeting, with notice to all participants, to the correctional institution to which the detainee has been transferred. This last order was apparently inspired by the snafu that occurred in Rafael's case in December 1994, when he was transferred from one correctional institution to another after a PPT meeting had been scheduled at the first institution. The PPT meeting had to be canceled because Rafael and the correctional school principal could not attend.
The hearing officer also ordered the department of education to take certain remedial steps, but that department has not appealed or otherwise objected to those orders and they are not before the court.
The plaintiff school district appealed the hearing officer's decision, naming the board of education and Rafael as defendants. The board takes the position that it is only a nominal defendant and has not participated in the defense of its hearing officer's decision.
Subsequent to the filing of this appeal, both the plaintiff CT Page 5252-SSSS school district and Rafael moved for permission to present evidence to the court in addition to that contained in the administrative record. The court granted both motions in accordance with General Statutes § 10-76h(d)(4)(B) and held a hearing for that purpose.
Based on the evidence adduced at the hearing, the court finds additional facts as follows. The charge for placement of a student like Rafael at Brown and Sullivan for ten and one-half months beginning July 1, 1997 will be between $116,200 and $141,000. The amount that the plaintiff school district would have spent for a special education program for Rafael during the ten and one-half months in 1993 — 1995 when he was incarcerated would have been $3100. To this should be added $24,700, the cost of custodial care, for a total cost of "residential" special education at the department of correction during 1993 — 1995 of $27,800. The services and environments offered by the two institutions, the plaintiff school district and the department of correction on one hand and Brown and Sullivan on the other, are vastly different, of course.
Following the evidentiary hearing in this court, the parties submitted briefs and presented oral argument. The court subsequently requested supplemental briefs, which defendant Rafael filed on April 24, 1996 and the plaintiff school district filed on April 25, 1996. On May 2, 1996, defendant Rafael filed an objection to portions of the plaintiff's brief, which objection the court has overruled.
As set forth in the briefs, the plaintiff school district advances essentially five arguments in support of its appeal: (1) that the hearing officer exceeded the scope of her authority in issuing the supplementary orders not specifically related to Rafael's education needs; (2) that any violations of state or federal special education laws committed by the plaintiff school district were not so serious as to justify the award of compensatory special education; (3) that the hearing officer failed to give sufficient consideration to the conduct of Rafael and his mother; (4) that the hearing officer erroneously concluded that state and federal laws require the plaintiff to provide special education services to pre-trial detainees and (5) that the hearing officer erroneously found that Brown and Sullivan is an appropriate institution to provide compensatory education to Rafael. CT Page 5252-TTTT
1. Supplementary Orders
It is undisputed that the defendant department of education conducted the hearing in this case pursuant to General Statutes § 10-76h. Subsection (a) of that statute provides that the purpose of the hearing shall be "to review: (1) the diagnosis, (2) the evaluation of special education programs provided or proposed for such child or pupil; (3) the exclusion or exemption from school privileges of such child or pupil or (4) any other matter concerning the child's special education or right to special education." In short, the purpose of the hearing is to review the special education needs of a particular child and how those needs should be met by the local board or unified school district responsible for providing the child's educational services.
Subsection (d)(1) of § 10-76h tracks subsection (a) in granting the hearing officer authority to order remedial action after hearing the case. Subsection (d)(1) thus provides that the "hearing officer . . . shall have the authority to confirm, modify, or reject any diagnosis, evaluation, educational program prescribed, exclusion or exemption from school privileges or any other matter concerning the child's special education or right to special education or to determine the appropriateness of an educational placement where the parent or guardian of a child requiring special education has placed the child in a program other than that prescribed by the planning and placement team, or to prescribe alternate special education programs for the child or pupil." In short, the authority of a hearing officer acting pursuant to subsection (d)(1) of § 10-76h is limited to issuing orders that pertain to the special education needs of the child who was the subject of the hearing.
The supplementary orders issued by the hearing officer in this case clearly went beyond the subject of Rafael's special education needs. These orders were directed at the plaintiff school district's administrative procedures in general. Since the orders are prospective in effect, they do not relate at all to Rafael, who had already been discharged from custody at the time the hearing officer issued them. For that reason, the hearing officer had no authority under § 10-76h to issue the supplementary orders concerning filling the vacant position, developing specific procedures for dealing with pre-trial detainees in need of special education services, and developing procedures for holding PPT meetings. "Action taken by an CT Page 5252-UUUU administrative agency in excess of its statutory authority is void and without legal effect." Young v. Chase, 18 Conn. App. 85,93 (1989). Accordingly, the plaintiff's appeal is sustained with respect to those orders.
2. Violations of Special Education Laws
The plaintiff school district attacks virtually every one of the hearing officer's findings and conclusions which led to the determination that the plaintiff violated federal and state laws requiring a special education program for Rafael during the periods of his incarceration. The goal of the attack is to establish that the violations, if any, were not "gross" violations and, therefore, not sufficient to require the award of compensatory special education services. The plaintiff cites Mrs.C. v. Wheaton, 916 F.2d 69 (2d Cir. 1990) in support of this theory.
Before considering the merits of the plaintiff's arguments, it is appropriate to review the basic provisions of the applicable laws and regulations. As noted above, the statutory and regulatory setting is the product of both federal and state enactments. The current applicable federal statute is the Individuals with Disabilities Education Act (IDEA), codified at20 U.S.C. § 1400 et seq. Its Connecticut counterpart is General Statutes § 10-76a et seq. The basic provisions of these statutes and their attendant regulations are not disputed. Any state which participates in the federal scheme by accepting federal subsidies must adhere to the requirements of the federal statutes and regulations. Connecticut is a participant and thus subject to the IDEA. The primary, overriding goal of these statutes and regulations is to guarantee to each child with a disability a free appropriate public education. Hendrick HudsonDist. Board of Education v. Rowley, 458 U.S. 176 (1981). See also Regs. Conn. State Agencies § 10-76d-1.
Pursuant to the federal/state statutory scheme, each local or regional board of education and each unified school district, like the plaintiff school district, must establish a procedure and staff to identify and evaluate children with disabilities and determine whether they are in need of special education. The board or school district must then convene a planning and placement team (PPT), which is composed of teachers and administrators specially trained and skilled in identifying and addressing the needs of children with disabilities. The child's CT Page 5252-VVVV parents must be afforded the opportunity to attend and participate in meetings of the PPT, as well as the child when appropriate.
"The `free appropriate public education' required by the (IDEA) is tailored to the unique needs of the handicapped child by means of an `individualized educational program' (IEP)."Rowley, supra, 458 U.S. 181. See also Regs. Conn. State Agencies10-76d-11, mandating the development of an IEP for each child in need. The IEP is thus the absolutely critical ingredient in the special education program for a child in need. As noted, federal and state statutes and regulations unequivocally require the responsible agency to develop an IEP in the case of every child with a disability. The development of such an IEP is the primary goal of the child's PPT, acting in conjunction with the parent and the child.
Both federal and state statutes afford a child and its parents administrative and judicial relief in cases where the child has been denied the benefits of the law. The courts have stressed two general criteria: (1) that the responsible school board must follow precisely the procedural requirements of the law and (2) that the substance of the child's program must provide appropriate educational benefits. Rowley, supra, 458 U.S. 206-207;Puffer v. Raynolds, 761 F. Sup. 838, 850-851 (D.Mass. 1988) (emphasizing necessity of adhering to procedural requirements of the law; in that case, the development of an IEP). The failure of a school board to satisfy either of these criteria provides a basis for administrative or judicial relief.
Various remedies are available to a child who has been denied the benefits of the special education laws. In the present case, as noted, the hearing officer awarded compensatory education to be provided after Rafael's Meriden supported program expires. This would continue for ten and one-half months after his twenty-first birthday. Such compensatory education after the child has become otherwise ineligible because of age is a legal remedy under Connecticut and federal law. Mrs. C. v. Wheaton, supra,916 F.2d 69; Pihl v. Mass. Department of Education, 9 F.3d 184 (1st Cir. 1993).
In the present case, there is ample evidence in the record to support the hearing officer's finding that the plaintiff school district failed to convene a planning and placement team meeting and failed to develop an IEP for Rafael during either of his CT Page 5252-WWWW periods of incarceration. Indeed, the plaintiff does not seriously dispute those findings. Rather, the plaintiff argues that it provided an acceptable alternative by following the IEP developed for Rafael by the Meriden board in 1994. The plaintiff also argues that its failure to convene a meeting of the PPT and develop an IEP were not significant or "gross" violations of the law because Rafael was a demonstrably unwilling student and his mother was apathetic in pursuing her son's educational needs. Neither of these arguments may be sustained.
With respect to the Meriden IEP, the hearing officer found that "from November 4, 1994, to January 20, 1995, (Rafael) did not have an IEP in place that reflected the program he was being offered. Conversely, the IEP accepted by USD #1 was not being implemented." This is not surprising in view of the fact that the IEP that had been developed by the Meriden board, which the court has reviewed in this record, was primarily aimed at Rafael's future education, after his release from custody and, therefore, was not tailored to the special circumstances of Rafael's incarceration or the educational services that the plaintiff school district could provide. In any event, the hearing officer's findings on this issue are plainly supported by substantial evidence in the record and may not be overturned by the court. Conn. Building Wrecking Co. v. Carothers, 218 Conn. 580,601 (1991).
With respect to the failure to hold a PPT meeting or develop an IEP, the plaintiff argues that the hearing officer was required to find that these were "gross" violations of the procedural requirements of the law in order to justify the award of compensatory education. Since the hearing officer does not explicitly state that she found the violations to be "gross," the plaintiff argues, the award of compensatory education was improper. The plaintiff cites Mrs. C. v. Wheaton, supra, 916 F.2d 69, in support of this theory. That case does not, however, support the plaintiff's position.
In Mrs. C. v. Wheaton, supra, the court held that the state of Connecticut must comply with the procedural safeguards of the IDEA before it terminates the special education program of a child who is a ward of the state. In that case, the child in question was twenty years old and had consented to the termination. The state had failed, however, to develop an IEP supporting the termination. In addition, the state had failed to provide the child's parent an opportunity to participate in the CT Page 5252-XXXX decision to terminate the program. The court held that these procedural defects sufficed to justify the award of compensatory education. The court implicitly acknowledged that every procedural violation of the IDEA may not justify an award of compensatory education, citing Burr by Burr v. Ambach, 863 F.2d 1071
(2d Cir. 1988), where such compensation was awarded only on the basis that the IDEA regulations had been "grossly violated." But the court held that the failure to develop an IEP with the parent's participation essentially deprived the child in that case of the needed special education and, for that reason, justified "a claim for compensatory educational relief." Mrs C.v. Wheaton, supra, 916 F.2d 75.
The federal court's decision in Puffer v. Raynolds, supra,761 F. Sup. 838, expressly holds that the failure to comply with the IEP requirement of the law is alone sufficient to justify compensatory relief. The hearing officer had ruled that the failure was inconsequential because the school system had offered a program of special education that it had devised for the child informally. The court reversed, stating "I am not as unconcerned with procedure as the hearing officer is here. Merely because the same result may — or may not — have been reached had proper procedures been followed is nor determinative of this case. There are some independent values served by following proper procedures . . . `Particularly in a statutory scheme such as the (IDEA) where great emphasis is placed upon procedural safeguards, we must assume that Congress intended some kind of relief when . . . a handicapped child is deprived of the procedural safeguards granted by (the IDEA).'" Id., 851, quoting Quackenbushv. Johnson City School District, 716 F.2d 141, 147 (2d Cir. 1983).
In the present case, the hearing officer characterized the procedural errors as "too pervasive to be considered harmless." She also found that the evidence in the record concerning the substance of Rafael's education while in custody indicated that it produced no "educational progress," thus failing the second test of Rowley, supra, 458 U.S. 206-207.
A basic principle of administrative law is that the scope of the court's review of an agency's decision is very limited. General Statutes § 4-183 (j) provides that "(t)he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact . . . The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced CT Page 5252-YYYY because the administrative findings, inferences, conclusions, or decisions are . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record."
Furthermore, "Judicial review of conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion." Conn. Light Power Co. v. Dept. of Public UtilityControl, 219 Conn. 51, 57 — 58 (1991).
In the present case, the hearing officer found that the procedural errors committed by the plaintiff school district and the inadequacy of the special education offered Rafael by the plaintiff justified awarding him compensatory special education following his attaining age twenty-one. Based on undisputed evidence in the record, in particular the lack of a proper IEP, and the requirements of federal and state law, as interpreted by the authorities cited, the court cannot find that the hearing officer's decision to order compensatory education for Rafael was unreasonable or an abuse of her discretion.
Conduct of Rafael and His Mother
In its brief on appeal, the plaintiff school district contends that "the hearing officer should have taken into consideration that (Rafael) refused to go to school until he enrolled in USD #1 school in November 1994. Even then, there were many occasions when (Rafael) threw away his books, refused to get up and refused to go to school." This contention may not be sustained.
The evidence that Rafael was reluctant and occasionally refused to attend the classes conducted by the plaintiff school district is undisputed. The hearing officer did not fail to consider this conduct, however; she specifically noted it in her decision.
It is likewise undisputed that Rafael was not and perhaps never will be suited for a conventional school program. In this regard, there is abundant evidence in the record, also cited throughout the hearing officer's decision, that Rafael is severely handicapped emotionally and intellectually.
In her decision, the hearing officer also cited the prison CT Page 5252-ZZZZ environment and the demands of Rafael's court schedules as factors tending to undermine his motivation to attend the plaintiff's classes.
The hearing officer thus took into consideration several important factors, including Rafael's conduct, in reaching her decision. Implicit in that decision is the view that Rafael's recalcitrance was caused, at least in part, by his psychological condition and the conflicting demands of the prison environment. As noted earlier, it is axiomatic that "Judicial review of conclusions of law reached administratively is . . . limited. The court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion." Conn. Light h PowerCo. v. Dept. of Public Utility Control, 219 Conn. 51, 57 — 58 (1991).
In the present case, the hearing officer ultimately determined that the plaintiff was at fault in not constructing an individualized educational plan for Rafael. Such a plan ideally would have addressed all of the obstacles in the path of Raphael's education while he was in custody, including his lack of motivation. It was not unreasonable or an abuse of discretion, therefore, for the hearing officer to place major emphasis on the failure of the plaintiff to comply with the law in that regard and discount Rafael's lack of cooperation.
The plaintiff's allegations concerning Rafael's mother are unclear and inadequately briefed. As appears from the record, Rafael's mother was involved in most of the significant events concerning his education, and, of course, it was she who requested the hearing to review her son's educational program and set these proceedings in motion. The plaintiff's argument that the mother's action or inaction should be a basis f, or reducing Rafael's educational opportunities may not be sustained.
Pre-Trial Detention
The statutes that create the plaintiff school district and establish its obligation to provide special education services to persons in the custody of the department of correction are General Statutes §§ 18-99a and 10-15d. Subsection (a) of §18-99a reads as follows:
The commissioner of correction may establish a CT Page 5252-AAAAA school district within the state department of correction for the education or assistance of any person sentenced or transferred to any institution of the department until released from its control, including but not limited to any person on parole. The school district shall be known as State of Connecticut-Unified School District #1.
Section 10-15d reads, in relevant part, as follows:
 . . . all provisions of the general statutes concerning education . . . shall apply to the operation of the . . . State of Connecticut-Unified School District #1 established pursuant to section 18-99a within the department of correction. . . .
The issue presented by this case is whether the phrase "any person sentenced or transferred to any institution of the department (of correction)" in § 18-99a excludes persons, like Rafael, who are held in the custody of the department prior to sentencing. The plaintiff school district argues that the plain words of the statute do not extend its obligation to provide educational services to pre-trial detainees.
The plaintiff argues also that the legislative history of the penal statutes supports the interpretation that § 18-99a
applies only to those persons who have been sentenced to the custody of the department after conviction of a crime. In this regard, the plaintiff points out that prior to 1979, General Statutes § 18-84 defined the terms "inmate" and "prisoner," wherever those terms are used in the general statutes, as "any person sentenced or transferred to any institution or facility of the department." At that time, § 18-99a read the same as it does now. Until 1979, therefore, the two statutes used the same language to define "inmates" and "prisoners" and those persons to whom the department is obligated to provide educational services through the plaintiff school district.
In 1979, the legislature expanded the definition of "inmate" and "prisoner" in § 18-84 so that statute now defines those terms, wherever used in the general statutes, as meaning "any person in the custody of the commissioner of correction or confined in any institution or facility of the department." That CT Page 5252-BBBBB new definition in § 18-84 would clearly encompass persons held prior to sentencing in lieu of posting bond, like Rafael, in addition to those who had been sentenced after conviction.
The legislature has not, however, changed the definition of those persons entitled to receive educational services and assistance from the plaintiff school district pursuant to §18-99a. They are still defined as persons "sentenced,"[2] and they are not designated as "inmates" or "prisoners." The legislative history of the applicable statutes suggests, therefore, that § 18-99a should be interpreted as excusing the plaintiff school district from the obligation to provide education services and assistance to pre-trial detainees who have not been sentenced. Support for such a result may be found in familiar rules of statutory interpretation. "When a provision is included in one statute and omitted in a related statute, courts presume that the omission was intentional." Sharp v. Wyatt. Inc.31 Conn. App. 824, 853 n. 19 (1993), citing Caron v. InlandWetlands Commission, 22 Conn. 269, 277 (1992).
The court's inquiry as to the obligation of the plaintiff school district to a child in need of special education may begin with an analysis of § 18-99a in accordance with ordinary rules of statutory construction, but it may not end there. The primary source of the state's obligation to provide special education to a child in need is the federal Individuals with Disabilities Education Act. "The Act[3] represents an ambitious federal effort to promote the education of handicapped children, and was passed in response to Congress' perception that a majority of handicapped children in the United States were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to drop out." Hendrick Hudson Dist. Bd. of Ed. v. Rowley, supra, 458 U.S. 179. "The [Act] provides federal funds to states that promise to provide at minimum a `free appropriate public education' for all handicapped children within the state . . . Connecticut has chosen to participate in the [Act] and has enacted legislation to implement the Act's requirements. See Conn. Gen. Stat. §10-76h." Mrs. C. v. Wheaton, supra, 916 F.2d 71. The mandate to participating states to provide free appropriate public education to children with disabilities extends to any such children who are in state custody as pre-trial detainees. Donnell v. IllinoisState Board of Education, 829 F. Sup. 1016, 1020 (N.D. IlL. 1993).
Although the holding of the Illinois federal district court CT Page 5252-CCCCC in the Donnell case is not controlling on this court, the federal court's reasoning is strongly persuasive. The scope of the federal law, imposed on participating states, extends to cover "all" children with disabilities. That does not mean all children except those in pre-trial detention. See 34 C.F.R. § 300.2
(b)(4), which provides that the Act applies to children in correctional institutions and Donnell, supra, 829 F. Sup. 1020. Based on the authorities cited above, this court concludes that the federal Act requires Connecticut to provide special education to children in need, like Rafael, who are in the custody of the department of correction as pre-trial detainees, prior to sentencing.
The plaintiff school district argues that even if Rafael was entitled to receive free special education during the period of his pre-trial incarceration, pursuant to federal laws and regulations, the state statute, § 18-99a, does not obligate the plaintiff to provide that education.
The only substantative objection to imposing on the plaintiff school district the obligation to provide special education to pre-trial detainees is that the language of § 18-99a would seem to restrict the obligation to sentenced prisoners. The result of that restrictive reading of § 18-99a, however, would be to totally deprive children with disabilities who are in pre-trial custody of the special education that those children are entitled to receive under federal law.
Under § 18-99a, the plaintiff school district is the sole agency responsible for providing educational services within the department of correction. Under § 10-15d, those education services include special education services to children with disabilities. If the plaintiff is absolved of that responsibility with respect to those in Rafael's circumstances, who or what will fill the void?
The plaintiff's suggestion that the cities and towns where pre-trial detainees reside should be responsible for their education while they are in custody has scant support in the law and the practical difficulties appear insuperable. Section 10-76d(e), cited by the plaintiff, simply does not pertain to children in the custody of the department of correction. As a practical matter, local boards of education cannot contract with private agencies to provide special education services for such incarcerated children because the children are not free, CT Page 5252-DDDDD literally, to receive the services. And, again for obvious practical reasons, the various local boards whose resident children are incarcerated cannot routinely send their own teachers into the different correctional institutions to conduct special education classes for those children on a regular basis. At least, there is nothing in the evidentiary record of this case that suggests that such a program would be a possibility.
In short, there is nothing in the law or in the facts of this case to indicate that any local or state agency other than the plaintiff school district had or should have had the responsibility for providing special education to Rafael while he was in the custody of the department of correction as a pre-trial detainee. It follows that Rafael would be totally deprived of the mandated special education if § 18-99a were interpreted to excuse the plaintiff of that responsibility.
"State law can be preempted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted. . . . If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law . . . or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." (Citations and internal quotation marks omitted.) Kenny v. Kenny, 226 Conn. 219, 224
(1993).
With respect to the education of children with disabilities in Connecticut, Congress has not entirely displaced state regulation. Rather, as noted, it has delegated to the state the task of providing the educational services required by federal law. This means that state law on the subject is preempted only to the extent that it would otherwise block "the accomplishment of the full purposes and objectives of Congress." Kenny v. Kenny,
supra, 224. In the present case, the state statute in question, § 18-99a, blocks the objective of Congress — to provide special education to all children with disabilities — if the statute is interpreted to exclude such children while they are held in custody as pre-trial detainees. In accordance with the doctrine of preemption, therefore, such an interpretation must be rejected.
For all of the foregoing reasons, the court holds that CT Page 5252-EEEEE General Statutes § 18-99a requires the plaintiff USD #1 to provide special education services and assistance to eligible children while they are in the custody of the department of correction as pre-trial detainees, prior to sentencing.
Appropriateness of Brown and Sullivan
The plaintiff school district contends that the special education program presently offered by the Brown and Sullivan school is not appropriate for Rafael. Therefore, the plaintiff argues, the hearing officer abused her discretion in ordering the plaintiff to provide the required compensatory education for Rafael at that school in the future. The plaintiff's claims in this regard may be summarized as follows: (1) Brown and Sullivan has failed to implement the IEP established for Rafael by the Meriden school board and currently in effect; (2) Brown and Sullivan's program does not provide adequate educational services; (3) the cost of Brown and Sullivan's program greatly exceeds the maximum cost of the program that the plaintiff school district would have provided during Rafael's incarceration even if the plaintiff had fully complied with the law.
The claims that the services rendered by Brown and Sullivan are inadequate either for implementing Rafael's current IEP or for providing a quality education are essentially based on the plaintiff's analysis of the evidence in the administrative record and the evidence presented at the supplemental hearing conducted by the court.
There is no question that Brown and Sullivan follows an educational philosophy and offers a program that may be characterized as unorthodox. Certainly, the evidence in the record concerning the philosophy and the program is susceptible to different interpretations and could support widely different findings and conclusions by different adjudicators.
As clearly spelled out in her final decision, the hearing officer, who was delegated the task of making the required findings and conclusions, determined that Brown and Sullivan was "an appropriate special education placement for [Rafael]" following his discharge from custody in January 1995. Basic principles of administrative law require the court to accept that determination. "The court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of its CT Page 5252-FFFFF discretion." Conn. Light Power Co. v. Dept. of Public UtilityControl, 219 Conn. 51, 57 — 58 (1991). Similarly, "(w)ith regard to questions of fact, it is (not) the function of the trial court . . . to retry the case or to substitute its judgement for that of the administrative agency." Id. "The question is not whether the trial court would have reached the same conclusion but whether the record before the commission supports the action taken." Hospital of St. Raphael v. Commission on Hospitals Health Care, 182 Conn. 314, 318 (1980). The court may not, therefore, overturn the administrative decision merely because it disagrees with the hearing officer's assessment of the quality or appropriateness of the Brown and Sullivan program. Nevertheless, the court does conclude that the case must be remanded so that the department of education may revise its decision requiring the compensatory education to be rendered by Brown and Sullivan.
The question of cost leads the court to consider the hearing officer's decision from a slightly different perspective. As noted earlier in this opinion, undisputed evidence presented at the hearing before this court established that the cost of the education at Brown and Sullivan (about $125,000) vastly exceeds the amount that the plaintiff and the department of correction would have paid for Rafael's education during the period for which compensation is owed (about $28,000, including the cost of confinement). The plaintiff argues that this would be a "windfall" for Rafael and not intended under the law. Instead, the plaintiff argues, Rafael is entitled to compensatory education limited to reimbursement of the amount that the plaintiff would have expended in 1993-1995 if it had complied with the law. This argument may not be sustained.
The hearing officer determined that Rafael is entitled to compensatory educational services, to be provided in the future by the plaintiff school district. This was an entirely appropriate remedy, given the fact that Rafael and his parents were obviously not able to obtain the denied education themselves and "front" the costs. Pihl v. Mass. Department of Education,9 F.3d 184, 189 (1st Cir. 1993); Mrs. C. v. Wheaton, supra,916 F.2d 69. Such compensatory educational services must, of course, be appropriate for the student at the time he receives them in order to comply with the requirements of the law. Straube v.Florida Union Free School District, 801 F. Sup. 1164, 1181
(S.D.N.Y. 1992); Puffer v. Raynolds, 761 F. Sup. 838, 853 (D. Mass. 1988). CT Page 5252-GGGGG
The hearing officer's decision that the plaintiff must provide educational services to Rafael in the future to compensate him for such services as were denied him while he was in custody was correct. The court concludes, however, that the hearing officer was in error in ordering, in her 1995 decision, that such services be provided at Brown and Sullivan or a comparable institution in 1997. The error is that the order specifying Brown and Sullivan was premature.
The letter and spirit of the federal and state special education statutes and regulations require that the special education program for a child with disabilities be individually designed to address the child's specific needs. Furthermore, the statutes and regulations require that the individualized education program be continuously reexamined so that it will accommodate the child's changing needs. Contrary to the plaintiff's assertion, this requirement that the special education program be designed to meet the child's changing circumstances applies with particular force to compensatory education to be provided in the future. See Straube, supra, 1181 and Puffer, supra, 853. The hearing officer's decision in this case, however, seeks to prescribe a specific institution and its specialized residential program for Rafael more than two years in advance of the time when the services are to be rendered. The problem is, as the Straube court observed in similar circumstances, Rafael's future educational needs are not immediately knowable. He may or may not need a residential program in 1997. He may or may not need a more orthodox academic program in 1997. He may or may not need more intensive psychological counseling in 1997. He may or may not need constant one-on-one supervision in 1997. He may even decline any further educational services in 1997.
The questions raised here illustrate that, in order fully to comply with the law and regulations in this case, it will be necessary to convene a planning and placement team in 1997 to evaluate Rafael's abilities and needs at that time so that an individualized educational plan can be developed that fully meets those needs. The court concludes, therefore, that the case must be remanded to the defendant department of education for a new decision that will provide for the design of an IEP for Rafael in 1997 that will cover the compensatory education to which he is entitled at that time.
In accordance with 4-183 (j), the plaintiff's appeal is CT Page 5252-HHHHH sustained. In accordance with § 4-183 (k) the case is remanded to the defendant department of education. The department is ordered to issue a new decision requiring the plaintiff school district to provide ten and one-half months compensatory special education for Rafael. The decision shall require the plaintiff to convene a meeting of a planning and placement team for Rafael at a time in 1997 to be determined by the department. The membership of the team shall include representatives of the plaintiff school district and others to be determined by the department in accordance with applicable law and regulations. In its decision, the department shall require the development of an individualized educational plan in 1997 to cover the compensatory education program to which Rafael is entitled at that time.
MALONEY, J.