MEMORANDUM OF DECISION
This is an administrative appeal brought by the plaintiff, Unified School District No. 1 ("USD # 1"), which is a special school district established in the department of correction pursuant to General Statutes § 18-99a. The plaintiff contests the department of education's decision ordering the plaintiff to provide the defendant, A.M., one year of compensatory education. The defendant, department of education ("DOE"), issued its decision, which contained other orders, pursuant to General Statutes § 10-76h. The plaintiff brings this appeal pursuant to that statute and the Uniform Administrative Procedure Act ("UAPA"), General Statutes §§ 4-166 et seq. and 4-183.
As background, the defendant A.M. is a 19 year old man, born in Puerto Rico on March 25, 1979. A.M. came to Connecticut in 1990 from Puerto Rico where his education had been limited to attendance of the first grade. Beginning in 1991, A.M. attended CT Page 1311 public schools in Hartford. After dropping out of school, A.M. was arrested for criminal offenses in April 1995. In February 1996, A.M. was committed to the custody of the Commissioner of Corrections and incarcerated at Hartford Correctional Center ("HCC") for over two months. Although discharged in May, A.M. was returned to HCC in June and then discharged from and returned to HCC after one day in July 1996.
In June or July 1996, the Office of Protection and Advocacy Services for Persons with Disabilities ("OPA") was contacted by Oscar Maldonado, a psychiatric social worker at HCC and on July 31, 1996, an advocate from OPA met with A.M. in the presence of Mr. Maldonado. On June 9, 1997, OPA requested a hearing relative to the special education program which the plaintiff USD # 1 offered A.M.
Thereafter, a hearing officer was appointed by DOE and a hearing on the matter was conducted on nine dates from July 10, 1997 through September 26, 1997. The hearing officer's decision, dated January 20, 1998, ordered USD # 1 to provide one year of compensatory educational services to A.M. The decision also contained other orders concerning A.M.'s testing and education. This appeal followed.
This court's "review of an administrative appeal is limited. Our Supreme Court has established a firm standard that is appropriately deferential to agency decision making, yet goes beyond a mere judicial `rubber stamping' of an agency's decisions. Connecticut Light Power v. Dept. of Public UtilitiesControl, 219 Conn. 51, 57, 591 A.2d 1231 (1991); Woodbury Water Co.v. Public Utilities Commission, 174 Conn. 258, 260, 386 A.2d 232
(1978). Courts will not substitute their judgment for that of the agency where substantial evidence exists on the record to support the agency's decision, and where the record reflects that the agency followed appropriate procedures. Samperi v. InlandWestlands Agency, 226 Conn. 579, 587, 628 A.2d 1286 (1993);Lieberman v. State Board of Labor Relations, 216 Conn. 253, 262,579 A.2d 505 (1990); Baerst v. State Board of Education,34 Conn. App. 567, 571, 642 A.2d 76, cert. denied, 230 Conn. 915,645 A.2d 1018 (1994)." (Internal quotation marks omitted.) Cabasquini v.Commissioner of Social Services, 38 Conn. App. 522, 525-26, cert. denied, 235 Conn. 906 (1995).
A court "must decide, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily CT Page 1312 or illegally, or abused its discretion. Ottochian v. Freedom ofInformation Commission, 221 Conn. 393, 397, 604 A.2d 351 (1992). Even as to questions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to facts found and could reasonably and logically follow from such facts. . . . New Haven v.Freedom of Information Commission, 205 Conn. 767, 774,535 A.2d 1297 (1988)." (Emphasis in original; internal quotation marks omitted.) Perkins v. Freedom of Information Commission,228 Conn. 158, 164-65 (1993).
In the present case, subsequent to the hearing, the hearing officer, Margaret J. Slez, made extensive findings of fact which were included in the Final Decision and Order No. 97-153, dated January 16, 1998. Specifically, the hearing officer made the following findings of fact:
 1. Prior to coming to the United States from Puerto Rico in 1990, when he was eleven years old, A. had attended school for only one year. Exhibits P-1, p. 1, R-97, p. 3, P-26, p. 22. For the school year 1991-1992, A. age 12 was placed in 7th grade at a public middle school. (Exhibit P-1)
 2. On October 23, 1991, A. was initially evaluated by the public school psychologist using the WISC-R Spanish edition and was found to have a full scale IQ score of 61, placing A. in the Mildly Mentally Retarded range. Other testing administered at that time, including the Test De Vocabulary En Imagenes Peabody [Peabody Picture Vocabulaly Test] (TVIP) and the Brigance, also suggested very low cognitive functioning. (Exhibit P-57, p. 3)
3. During the school year 1992-1993, A.'s attendance and academic performance at the public middle school appear to have been affected by the impact on A. of his brothers's death and A.'s psychiatric hospitalization for depression and suicidal ideation. (Exhibit P-24, p. 1; P-57, p. 1) On January 21 1993, A. was classified as learning disabled (LD) and was determined to be displaying characteristics indicative of emotional disturbance and/or social maladjustment. (Exhibits P-13, p. 1, 13) An IEP was developed by the public middle school. (Exhibit P-13) CT Page 1313
 4. During the school year 1993-1994, A. was reclassified as educable mentally retarded (EMR) and placed in a highly structured, self-contained bilingual special education program at the public high school but failed to attend on 125 (of 180) days. (Exhibits P-15, P-12, p. 2)
 5. During the 1994-1995 school year, A. did not attend. In April 1995, A. was arrested.
 6. On July 18, 1995, A. was admitted to Riverview Hospital pursuant to a court order for restoration to competency under C.G.S. Section 54-56d. (Exhibit P-22)
 7. Upon admission to Riverview in 1995, A. underwent psychological, psycho-social, and psychiatric assessments. Exhibits P-23, P-24, P-25. The clinical psychologist at Riverview found that A.'s history to severe early childhood deprivation and abuse contributed to an impression of serious undersocialization and conduct difficulties, and that the "intellectual assessment reveals a boy with estimated at least average overall cognitive potential who is clearly capable of learning from his experiences and whose deficits are largely attributable to lack of cultural and educational exposure." (Exhibit P-23, p. 5 of 5)
 8. In her psychosocial assessment, the Riverview psychiatric social worker reported that A.'s limited vocabulary comprehension in speaking Spanish and limited intellectual functioning impact upon A.'s ability to communicate or develop social skills necessary to develop and maintain peer relations. (Exhibit P-25)
 9. The initial report of the psychiatric evaluation done by the Riverview child/adolescent psychiatrist stated that A. is "a very simple boy with profound impairments in communication and judgement, as well as possible psychotic and affective symptomatology which currently limits his competency." (Exhibit P-24, p. 6)
10. Within a month after A's admission to Riverview (USD # 2), a PPT meeting was convened in a order to review previous and current assessments, to determine A's eligibility for special education and related services, and to develop an IEP. (Exhibit P-26, p. 18) CT Page 1314
 11. The PPT at Riverview determined that A. was eligible to receive special education services based on the exceptionality of socially/emotionally maladjusted, that further assessment regarding speech and language impairment was required in order to develop appropriate goals and objectives, that "consultation" with an ESL teacher would be provided, and that neither an extended school year nor other residential placement was required in order for A. to benefit from his education. (Exhibit P-26, p. 20)
 12. Based on the 1995 IEP developed by Riverview (USD # 2), A. was placed in an ungraded self-contained classroom on the Riverview campus (a residential facility) and provided with speech/language therapy and individual counseling. (Exhibit P-30, pp. 1-4)
 13. On October 17, 1995, A. was determined to be competent to stand trial and was discharged from Riverview. (Exhibit P-33, p. 6) The record does not reveal where A. went on discharge from Riverview nor does it reveal the subsequent disposition of criminal charges against A.
 14. While A. was at Riverview, his mother moved to another town in Connecticut. Upon A.'s discharge from Riverview he was to have attended the public high school in the town where his mother was now living. On November 13, 1995, a PPT meeting was held and A. was identified as a special education student under the exceptionality of multi-handicapped. (Exhibits P-36, P-47, p. 2) However, there is no record that A. was ever registered or attended school during the remainder of the 1995-1996 school year. (Exhibit P-47)
 15. On February 20, 1996, A. was arrested for burglary and larceny, and was incarcerated at Hartford Correctional Center (hereinafter "HCC"), at which time he was observed and assessed by a Department of Correction (hereinafter "DOC") social worker in the South Block Mental Health Unit. (TR. 7-14-97, pp. 10-12; P-140, pp. 101-112)
16. When A. was interviewed by the DOC psychiatric social worker on February 20, 1996, he indicated that he was not interested in being referred for educational services. (TR. 7-14-97, p. 63; P-140, p. 109) CT Page 1315
 17. On March 21, 1996, A. did fill out the "HCC School Referral Form," stating his interest in attending school, checking "no" to the question regarding "History of Special Education," and giving his permission to have his previous high school records released to USD # 1. (Exhibit P-37, R77) No attempt was made by USD # 1 personnel at that time to obtain A.'s records. (TR. 7-14-97, p. 99)
 18. According to "District Student Find Procedures" (P-79) all inmates who choose to attend school are to be screened for potential handicapping conditions within two weeks of their assignment to school. Such screening is to include "the administration of standardized group intelligence and achievement tests and an interview by the school psychologist or special education teacher." (Exhibit P-79, p. 2; TR. 7-10-97, p. 38)
 19. Although A. was placed in an ESL class at HCC on March 21, 1996, screening for potential handicapping conditions did not take place within the first 4 days. On March 25, 1996, A. received a disciplinary report for arson and was placed in the restricted housing unit administrative detention and, subsequently, in punitive segregation until May 3, 1996. (R-81, p. 1; R-59; R-62)
 20. The USD # 1 principal at HCC testified that if an inmate has violated certain HCC rules and regulations and, as a result, is confined to quarters or placed in restricted housing or punitive segregation, then the inmate is not permitted to attend classes as a consequence of such custodial sanction. (TR. 7-10-97, pp. 63-64)
 21. On May 2, 1996, A. was released from custody of the DOC but was rearrested on June 5, 1996 on new charges, Exhibit P-85, R-67, and was again incarcerated at HCC.
 22. In June 1996, the DOC social worker referred A. to the State of Connecticut Office of Protection Advocacy for Persons with Disabilities (OPA) in the belief that OPA could assist A. in obtaining post-incarceration services from the State of Connecticut Department of Children and Families (DCF). (Exhibit P-43; TR. 7-14-97, pp. 47-51)
23. On July 8, 1996, A. was re-enrolled in the ESL class. (R-81) On July 9, 1996, A. was released from custody of the CT Page 1316 DOC. For reasons not explained by witness testimony or the record, A. re-admitted to HCC on July 10, 1996. (R-81, P-85)
 24. Beginning in July 1996 and until September 8, 1996, A. was seen on an outpatient basis from time to time by staff in the HCC Mental Health Unit. (Exhibit P-140, pp. 33-38)
 25. On July 31, 1996, a social worker from OPA interviewed A. in the presence of the HCC psychiatric social worker who noted no signs or evidence of thought disorder on the part of A. but that A. displayed a cognitive or behavioral disorder. (Exhibit P-43)
 26. In August 1996, A. was placed in punitive segregation as a result of several disciplinary reports for activities including but not limited to attempted to strike an officer, flooding his cell, urinating on the cell floor, throwing feces, destruction of DOC property, and possession of security risk group (gang] affiliation materials. (R.-42, 43, 44, 45, 46, 47)
 27. On September 9, 1996, A. was released to Riverview (USD # 2) for court-ordered restoration to competence to stand trial, and remained at Riverview until October 31, 1996. (Exhibits P-45, P-55)
 28. On September 9, 1996, a child study team (CST) meeting was held at Riverview to deal with A. as an incoming student. Riverview staff (USD # 2) certified that A.'s special education eligibility had been determined by the previous public school district on November 13, 1995, and the IEP developed at that time would be implemented. A PPT meeting was scheduled for October 4, 1996. (Exhibit P-48) A.'s mother and DCF social worker were given notice of the PPT meeting, Exhibit P-49, but they did not attend. (Exhibit P-50, p. 3, 18)
29. On October 4, 1996, the PPT determined inter alia that:
 a.) no further assessment of A. was warranted at that time; Exhibit P-50, p. 4;
 b.) A. was eligible to receive special education services based on the exceptionality of serious emotional disturbance; Exhibit P-50, p. 4, 19;
c.) C. should participate in the regular behavior management CT Page 1317 program at Riverview; Exhibit P-50, p. 4
 d.) A. should receive, as related services, individual counseling and speech and language therapy to address A.'s emotional issues and language difficulties; Exhibit P-50, p. 5;
 e.) the goals and objectives developed at the 8-17-95 PPT were appropriate for current implementation; Exhibit P-50, p. 5
 30. On October 10, 1996, the IEF developed by Riverview (USD # 2) was sent to A.'s mother. (Exhibits P-51; P-50, pp. 6-17)
 31. On or about October 21, 1996, Paula Fradiani, the Connecticut State Director for Brown and Sullivan, Inc., provided to OPA a "detailed narrative" regarding the structure of the Brown and Sullivan program and safety considerations. (Exhibit P-52) Franiani did not review A.'s records or interview A. in order to prepare this proposal for services. (TR. 9-26-97, p. 99) As of the date of her testimony, September 26, 1997, Fradiani:
 a.) could state no specific housing plan for A.; TR. 9-26-97, p. 100-101
 b.) was unaware of A.'s counseling needs; TR. 9-26-97, p. 106;
 c.) was unaware of A.'s educational needs; TR. 9-26-97, p. 106;
 d.) was unaware of A.'s vocational needs; TR. 9-26-97, p. 108
 Frandiani stated that the Brown and Sullivan "proposal" (P-52) is a generic treatment plan not drafted specifically for A. (TR. 9-26-97, p. 119-120)
32. On October 21, 1996, the Riverview child and adolescent psychiatrist, Dr. Richard Pugliese, and clinical psychologist/case manager, Dr. Peter McGreen, issued a written report (R-100) to the Superior Court based upon observation of A., interviews with A. conducted both in Spanish and in English, review of material from A.'s Riverview hospitalization in 1995, discussions with A.'s OPA advocate and his DCF investigation worker, as well as CT Page 1318 evaluation, assessment and treatment of A. in the Riverview psychiatric milieu. (R.-100, pp. 102)
 33. The report (R-100) issued on October 21, 1996, included the following:
 a.) By unanimous opinion of the clinical team, A. was found competent to stand trial for the pending charges;
 b.) At the time of admission A. was seen as a 17 year-old with "some limited language functioning;" R-100, p. 5
 c.) A.'s "extremely tumultuous family history, developmental delays and multiple incarcerations as well as a history of suicide attempts were noted;" R-100, p. 5;
 d.) "Past diagnoses of schizophrenia and mental retardation have since been negated;" R-100, p. 5;
 e.) Although A. presents as simplistic in processing, there has been no auditory or visual hallucinations reported;" R-100, p. 5;
 f.) A.'s "verbal skills fall within Average range of intellectual functioning;" R-100, p. 5;
 g.) A. stated that he has been a gang member including while he was incarcerated; R-100, p. 5;
 h.) A. was "able to listen carefully and clearly to several discussions of the charges against him and his attention and concentration were particularly good;" R-100, p. 5
 i.) A.'s "ability to cooperate, attend and focus on discussions is much improved" during this stay at Riverview; R-100, p. 5;
 j.) Although A. tends "to use claims of ignorance to avoid further discussions," he is "able to respond appropriately" "when pressed for future discussion or expectations;" R-100, pp. 5-6;
k.) A. "denies depression, suicidal ideation or psychosis," R-100, p. 6; CT Page 1319
 l.) A.'s mother has not been a participant during this evaluation despite attempts to notify [her] including attempts by mail;" R-100, p. 6;
 m.) A.'s "health is notably good" and his hygiene good; R-100, pp. 6-7;
 n.) A.'s compliance with the Riverview unit/routine described as marginal and "somewhat inconsistent;" R-100, pp. 8, 9. A. becomes "mildly annoyed when given lower gradings for not complying with unit program" and "tends to blame others." R-100, p. 10;
 o.) "Although much more adept in Spanish," A. "has begun to use English more, especially when it is required as part of his overall treatment plan;" R-100, p. 10;
 p. ) As a result of neglect, abuse, isolation, and developmental delays in childhood, A. is a "rather primitive undersocialized young man with poor impulse control for his needs" who "tends to be rather oppositional and defiant of authority;" R-100, p. 12
 q.) A. described as having been "involved in some underground negative behaviors" the Riverview unit and as "rather sneaky and manipulative." "There is clearly a sense and if [A.] wants something he will attempt to get it especially if he feels he can get away with it." R-100, p. 12.
 34. Upon discharge from Riverview (USD # 2), A. was issued a report card (P-53) showing the following information for A. for the period September 9, 1996 to October 31, 1996:
 Language Arts A/2 Mathematics A-/2 Social Studies A-/2 Science B-/3 Health B-/3 Art C/3 Music C/3 Phys. Ed. B+/2-3 Family and Consumer Sciences A/2
A= Outstanding 1= Motivated/contributing B= Good member of class C= Satisfactory 2= Good attitude and effort D= Needs Improvement 3= Satisfactory attitude and F= Unsatisfactory effort INC= Incomplete 4= Attitude and effort need CT Page 1320 improving 5= Very poor attitude and effort
 35. On November 1, 1996, A. was released from Riverview and returned to DOC custody at HCC. (R-61, p. 2) Upon his return to HCC, A. signed a "Consent for Admission to South Block Mental Health Unit" (form printed in English). (Exhibit P=140, p. 135)
 36. According to "District Student Find Procedures," in an effort to identify all disabled students, "the schools at each institution/center within [USD # 1] continually survey all places within each institution/center in which disabled students may be found." P-79, p. 2. Both the USD # 1 principal and the special education teacher at HCC testified that although the HCC Mental Health Unit is such a facility, they did not survey the facility. (TR. 7-14-97, pp. 99-103; TR. 7-10-97, pp. 101-104)
 37. Upon referral by an OPA social worker, A. was evaluated in November 1996 by Dr. Nelson E. Rivera, psychologist, who was requested to review all previous psychological and educational testing of A., to determine whether A. is mentally retarded and/or has a psychiatric disorder, and to provide a professional opinion. (Exhibit P-57, pp. 1, 2)
 38. Dr. Rivera interviewed and tested A. at HCC, finding A.'s thought processes to be normal, although somewhat concrete, with no indications of delusional thinking. Evaluation of cognitive processes indicated that A.'s attention and concentration skills were slightly below normal. A.'s intellectual ability was found to be low, his fund of information "below expectation," abstract ability poor, and computational skills judged to be below average. (Exhibit P-57, p. 4)
39. Dr. Rivera administered the Kaufman Brief Intelligence Test (K-Bit) to estimate A.'s intellectual ability and, based on the test results, estimated that A. was functioning in the Mild Mentally Deficient range. No significant discrepancy was found between verbal and nonverbal performance, "suggesting that both areas are equally poorly developed and suggesting low cognitive and academic functioning." (Exhibit P-57, p. 5) CT Page 1321
 40. Using the Vineland Adaptive Behavior Scales-Spanish Form, Dr. Rivera found A.'s adaptive skills low and, along with A.'s mentally deficient functioning, suggestive of mental retardation requiring a supervised but not institutional setting. (Exhibit P-57, p. 6)
 41. Projective testing utilizing Exner's Comprehensive Scoring System for the Rorschach indicated that A., although not actively psychotic, has fewer resources available than most people his age, is susceptible to disorganized thinking when confronted with stress, frequently disregards social demands and expectations, and tends to over-personalize situations which, in turn, leads to poor social judgment. (Exhibit P-57, p. 6)
 42. According to Dr. Rivera, the prognosis for A. is "guarded" given his behavioral problems, limited cognitive functioning, learning problems, and lack of structure and family support. (Exhibit P-57, p. 7)
 43. Despite the fact that the referral for evaluation of A. by Dr. Rivera had been made by OPA, the results of which evaluation were set forth in a written report dated 12-3-96 (P-57), no OPA attorney, social worker, or advocate brought the report to the attention of USD # 1 or requested a PPT meeting on behalf of A. in November or December of 1996. (TR. 9-16-97, pp. 49-54)
 44. Except for references to the "District Student Find Procedures" (P-79), neither the HCC principal nor the Mental Health Unit psychiatric social worker nor the HCC special education teacher gave any testimony which demonstrated clear or concrete knowledge of the IDEA and/or Connecticut law regarding special education and the obligations of USD # 1 to inmates in need of special education and related services. (TR. 7-10-97, pp. 29-54; TR. 7-11-97. pp. 50-52; TR. 7-14-97, pp. 50-51; TR. 7-14-97, pp. 77-88)
45. According to the notes (P-61, p. 1) of the DCF education consultant, A. was enrolled in an ESL class at HCC for the period 11-5-96 through 12-3-96 but his attendance was poor and, as a result, A. was placed on a Self Study Program. When A. stopped completing assignments he was. dropped from the program. The DCF education consultant obtained this information CT Page 1322 from the HCC school psychologist on March 21, 1997, at which time A. was in the HCC restricted housing unit and was not allowed out of that unit in order to attend school. (Exhibit P-61, p. 1)
 46. On March 21, 1997, the DCF education consultant informed the HCC school psychologist that A. is a special education student identified as seriously emotionally disturbed and informed the HCC school psychologist of the 10-4-96 IEP developed by Riverview (USD # 2). (Exhibit P-61, p. 1)
 47. On March 27, 1997, the HCC school psychologist, the special education teacher, and the ESL teacher met and determined the necessity of obtaining A.'s record from Riverview (USD # 2) in order to ascertain A.'s background and educational needs. (Exhibit P-62, p. 1)
 48. On April 1, 1997, A. signed a USD # 1/Connecticut DOC "Statement of Rights" (form printed in English), indicating that he was interested in attending school. (Exhibit P-64)
 49. At some time prior to April 10, 1997, an OPA advocate contacted Lillian Cruz, the Executive Director of Humanidad, Inc., a social service agency serving persons with developmental disabilities. Lillian Cruz and the OPA advocate visited A. at HCC for approximately 45 minutes. (TR. 9-22-97, pp. 21-25) On April 10, 1997, a proposal for services to A. was received by OPA from Humanidad Inc. (Exhibit P-66; TR. 9-22-97, p. 25)
 50. Lillian Cruz did not review any of A.'s educational records prior to submitting the Humanidad, Inc. proposal to OPA and, at the time of her testimony on 9-22-97, had no specific program or plan to address A.'s educational or vocational deficiencies. (TR. 9-22-97, pp. 26-63)
51. On April 25, 1997, the HCC school psychologist, the special education teacher, and the ESL teacher met to review A.'s records and decided that beginning on 5-2-97 the special education teacher would provide Adult Basic Education (ABE) instruction to A. in the segregated housing unit at HCC as a means of assessing A.'s educational needs in order to develop a program for A. (Exhibit P-62, p. 2) CT Page 1323
 52. On or about April 29, 1997, OPA received the proposed decision of the Department of Mental Retardation (DMR) denying A.'s eligibility for services from DMR on grounds that "although A. reportedly distorts reality, has disorganized thinking, a language disability, and a history of educational and social deprivation, he was still able to perform within at least the low average range of intelligence" on psychological evaluations undertaken on 10-3-91, 9-20-95 and 4-1-96. (R-97)
 53. On May 9, 1997, the HCC school psychologist, the special education teacher, and the ESL teacher met and decided to convene a PPT meeting on 5-22-97. The HCC special education teacher had met with A. on 3 occasions in the previous 7 days and determined that A. could read on a pre-first grade level, that A.'s limited understanding of English impeded progress, and that A.'s math skills were a relative strength since A. could multiple and divide. (Exhibit P-62, p. 3)
 54. On May 9, 1997, notice of the PPT meeting was sent to A.'s mother by certified mail but was returned as "unclaimed." (P-69, P-72) Notice of the PPT meeting was also sent to a DCF social worker trainee familiar with A.'s case. (p-71) The DCF social worker subsequently informed the USD # 1/HCC principal that since A. had turned 18 on 3-25-97, DCF would have no role in the matter. (Exhibit P-73)
 55. On May 22, 1997, the PPT meeting was convened to formulate an appropriate education plan for A. In addition to A., the USD # 1/HCC school principal, school psychologist, special education teacher, and ESL teacher were present. Also present were an HCC correction officer from the restricted housing unit, a translator, two OPA advocates and an OPA attorney. A.'s mother was not present. (Exhibit P-74, p. 1)
 56. On May 22, 1997, one of the OPA advocates in attendance stated that OPA had first become involved in A.'s case in July 1996. (Exhibit P-74, p. 1; TR. 9-16-97, p. 47)
 57. On May 22, 1997, the OPA attorney revealed the existence of and produced the reports of independent psycho-educational evaluations of A. (P-57, P-67) performed at HCC by Dr. Rivera in November 1996 and in April 1997. (Exhibit P-74, p. 2)
58. On May 22 1997, in response to expressed concerns CT Page 1324 regarding A.'s chronic disciplinary problems (R-1-through R-60) and whether an appropriate academic program and related services could, in fact, be provided in the HCC restricted housing unit, the USD # 1/HCC principal stated that the HCC educational staff is required to abide by housing decisions imposed as disciplinary sanctions. (Exhibit P-74, p. 2)
 59. On May 22, 1997, the HCC school psychologist stated that since HCC education personnel had not had the benefit of Dr. Rivera's reports prior to the PPT meeting, development of an appropriate IEF could not take place without review of Dr. Rivera's findings. The PPT agreed to reconvene on June 6, 1997. (Exhibit P-74, p. 2)
 60. On June 6, 1997, the PPT meeting was reconvened. Both A. and his mother were present. After review of all available psychological testing results, all parties agreed that A. is to be identified as educable mentally retarded (EMR). (Exhibit P-75)
 61. On June 6, 1997, in discussion of A.'s self-mutilation, the special education teacher reported that as of 6-4-97 all wounds on A.'s legs has healed, but A. then revealed new, open wounds on his legs. (P-75; TR. 7-10-97, p. 135) In the written report of an educational evaluation of A. undertaken by Rammler Wood, which report is dated 7-1-97, the evaluator states, "A. confirmed that he had used a staple to draw lines in his leg because he was bored but that he wasn't doing this anymore. . .[I]t can be expected that A. might resume his [self-injurious behavior] if he is not give adequate alternative activities to alleviate his boredom." (Exhibit P-77, p. 7)
 62. On June 6, 1997, it was noted that A.'s placement in the restrictive housing unit was due to chronic disciplinary problems and that protective custody status was for A.'s own safety. (Exhibit P-75)
63. On June 6, 1997, the HCC special education teacher presented an educational plan for A. in which the special education teacher and the ESL teacher would work with A., one-on-one, in the restricted housing unit, with a primary goal of transitioning A. back into the HCC general population so that A. could attend regular classes. (Exhibit P-75; TR. 9-16-97, p. 108) CT Page 1325
 64. On June 6, 1997, the OPA advocate and its attorney questioned the components of the plan presented by the HCC special education teacher, including the academic, speech and language, occupational therapy, behavior modification, and counseling components, and challenged the transition plan as not related to a transition plan as contemplated by the IDEA. (TR. 9-16-97, pp. 108-121; P-75)
 65. On June 6, 1997, the USD # 1/HCC principal then interrupted and recitation of propose program's inappropriateness and inadequacies and asked A.'s OPA attorney to "cut the chase." (TR. 9-16-97, p. 121) A.'s OPA attorney stated that the proposed educational plan was unacceptable, that the proposed plan could not meet A.'s needs and that A. is entitled to compensatory education because A. was not identified as being in need of services when he arrived at HCC and was under the age of 18. (Exhibit P-75)
 66. On June 9, 1997, a due process hearing request was filed on behalf of A. by OPA, citing failure of USD # 1 to provide A. with a free appropriate public education; failure of USD # 1 it identify and evaluate A. for special education services; disagreement with A.'s current educational program; "disagreement with least restrictive environment for" A.; and requesting compensatory education.
 67. On August 27, 1997, A. was released to Connecticut Valley Hospital for court-ordered restoration to competency to stand trial pursuant to C.G.S Section 54-56d.
 68. On November 25, 1997, A. was found not competent to stand trial, non-restorable, and is currently a voluntary inpatient at Connecticut Valley Hospital.
As concluded by the hearing officer, and not contested in this administrative appeal, despite conflicting diagnoses, A.M. was at all pertinent times eligible for special education since he consistently was identified as mildly mentally retarded. Under the Individuals with Disabilities Education Act ("IDEA") then, A.M. was entitled to a free appropriate public education ("FAPE"). The standard to determine whether a local educational agency has met its obligation to provide a FAPE was established by the United States Supreme Court in Board of Education ofHendrick Hudson Central School District v. Rowley, 458 U.S. 176, CT Page 1326102 S.Ct. 3034 (1982). The two prong test to determine whether a local educational agency has provided a FAPE is:
 First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?
 (Footnotes omitted.) Board of Education of Hendrick Hudson Central School District v. Rowley, supra, 458 U.S. 206-207.
In Connecticut, USD # 1 is the agency responsible for providing educational services to inmates in DOC facilities who are under the age of 21 and have not graduated from high school. General Statutes § 18-99a. All provisions of the General Statutes concerning education apply to USD # 1, including §10-76d which implements the IDEA requirement that a FAPE be provided to all handicapped children within the state. General Statutes § 10-15d. The requirement to provide a FAPE to children with disabilities applies to children being held in state custody as pretrial detainees. 34 C.F.R. § 300.2
(b)(4); Unified School District # 1 v. Department of Education,45 Conn. Sup. 57 [1996).
In this administrative appeal, the plaintiff argues that the hearing officer erred since her findings and conclusions were in excess of DOE's statutory authority; based upon unlawful procedure; affected by an error of law; clearly erroneous in view of the evidence; and arbitrary and capricious. The defendant OPA argues that the hearing officer's decision was correct and that USD # 1 completely disregarded all of A.M.'s procedural rights under federal and state special education laws.
The plaintiff argues, as it did before the hearing officer, that OPA believed as early as November 1996 that Angel was eligible for special education services, but failed to complain to USD # 1 or otherwise alert USD # 1 as to the potential problem. The plaintiff thus asserts the equitable defense of laches which pertains "where it is clear that a plaintiff unreasonably delayed in initiating an action and a defendant was prejudiced by the delay." K.P. v. Juzwic, 891 F. Sup. 703, 715
(D. Conn. 1995). Since equitable considerations are relevant in fashioning relief under IDEA, School Commission of Burlington v.Department of Education of Massachusetts, 471 U.S. 359, 374,105 S.Ct. 1996 (1985), the plaintiff argues that the hearing officer CT Page 1327 erred in not attributing the unreasonable delay of OPA in initiating action to A.M. and thus precluding the award of compensatory education for the period November 1, 1996 to May 22, 1997. Indeed, the hearing officer found that "certainly, OPA, would have known, in November 1996, of the decision in State ofConnecticut Unified District # 1 v. Department of Education,17 Conn. L. Rptr. No. 13, 340 (October 14, 1996), regarding the state's obligation under IDEA to meet the special education needs of children in custody of the DOC. . . ." but concluded, "[n]evertheless, the Hearing Officer is unwilling to ascribe OPA's unreasonable delay to [A.M.] or to inflict consequences for such delay on [A.M.]'s prayer for relief. Therefor, USD # 1's argument regarding the time period November 1996 to May 1997 is rejected." (Return of Record ("ROR"), Decision 97-153, p. 13.)
This court cannot find the hearing officer's findings in this regard erroneous. As determined by the hearing officer, USD # 1 failed to identify A.M. as in need of special education from February 20, 1996 to May 2, 1996 (51 school days), June 5, 1996 to September 9, 1996 (67 school days), and November 1, 1996 to March 21, 1997 (99 school days). Thus, USD # 1 was in violation of General Statutes § 10-76d(a). Moreover, General Statutes § 10-76d(b) requires each school district to develop an Individualized Education Program ("IEP") for any child who has been identified as in need of special education. The IEP is developed by a team including administrators, teachers, the parents or guardian, and if appropriate, the child. This team is referred to as the Pupil Placement Team (PPT). By failing to convene a PPT meeting and to develop an IEP for A.M. until May 22, 1997, USD # 1 violated General Statutes § 10-76d(b). Finally, during the periods of incarceration set forth above, USD # 1 completely failed to comply with the IDEA, General Statutes §§ 10-76d, 10-76h, 10-186 and 18-99e.
While OPA did fail to disclose Dr. Rivera's report from November, 1996 until May 1997, knowing that A.M. was probably eligible for special education services, that delay is not attributable to A.M. on a laches theory and does not preclude compensatory education. See Murphy v. Timberlane Regional SchoolDistrict, 973 F.2d 13, 16-17 (1st Cir. 1992). Compliance with the IDEA is the responsibility of the school district, not the student.
Even if the delay could be attributable to A.M. based on an agency theory, USD # 1 has failed to demonstrate resultant CT Page 1328 prejudice. The testimony before the hearing officer established that USD # 1 simply was not able to provide a FAPE to A.M. In terms of costs to USD # 1 as a ground for prejudice, there would have been costs for providing a FAPE to A.M. if done in a timely fashion. Murphy v. Timberlane Regional School District, supra, 973 F.2d 17. Thus, the plaintiff's laches argument must fail.
Here, the plaintiff argues that it was error for the hearing officer to have ordered compensatory education for the period March 21, 1997, when A.M. was first identified as a special education student, to August 27, 1997, when he was transferred to Connecticut Valley Hospital ("CVA"). The record supports the conclusion that for the period from March 21 through May 22, 1997, although A.M. had been identified as a special education student in need of services and USD # 1 had begun the procedure necessary to design an appropriate program for him, the most recent IEP developed for him was not being implemented nor were any educational services being provided. From May 22 to August 27, 1997, while housed in the restricted unit at HCC, A.M. did receive approximately two hours per week of instruction from a special education teacher. The plaintiff argues, generally, that the program offered to A.M. was sufficient to provide some educational benefits, and that the hearing officer's decision that USD # 1 failed to provide a program from which A.M. could benefit educationally was not supported by substantial evidence
"The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. General Statutes § 4-183 (j)(5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) Dolgner v. Alander, 237 Conn. 272, 281 (1996). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . ." (Citations omitted; internal quotation marks omitted.) Id. CT Page 1329
From May 22 through August 27, 1997, when A.M. was receiving approximately two hours per week of instruction which consisted primarily of delivering math and reading workbooks to him and their subsequent correction by an HCC special education teacher after completion by A.M. on his own, USD # 1 failed to provide a program from which A.M. could derive educational benefit. Boardof Education of Hendrick Hudson Central School District v.Rowley, supra, 458 U.S. 176. Here, the hearing officer's finding in that regard was supported by substantial evidence.
As is clear from her decision, the hearing officer did recognize and attempt to balance the state's legitimate penological interests with A.M.'s educational needs. See NewHampshire Department of Education v. City of Manchester,
23 IDELR 1057 (1996). The hearing officer concluded that A.M.'s cell was the least restrictive environment in light of the circumstances, but could not approve of the quality or quantity of the instruction. The hearing officer found:
 18. There is no evidence in the record that USD # 1 has sufficient staff, funding, or other resources to properly implement the IDEA or to comply with C.G.S. Section 18-99a
which requires USD # 1 to provide special education services and assistance to eligible children while they are in the custody of the DOC as pretrial detainees prior to sentencing. Furthermore, there is no evidence in the record that USD # 1 has adequate personnel proficient in Spanish to implement the IDEA or its own "District Student Find Procedures" in order to address the special education needs inmates like A. whose dominant language is Spanish.
 19. However, neither USD # 1 nor the Hearing Officer is free to ignore the clear mandates of federal and state law. Therefore, since there is no evidence in the record to demonstrate that USD # 1, during the time period set forth above, followed the procedural requirements of the IDEA or offered a program from which A. could derive educational benefit, it is held that USD # 1 has failed to satisfy either prong of the standard for an appropriate special education program as set forth in Rowley supra.
(ROR, Final Decision and Order 97-153, p. 15). The hearing officer's findings are supported by substantial evidence in the record and the legal conclusions are correct. CT Page 1330
The plaintiff's remaining arguments concerning the uncertainty of A.M.'s release from Connecticut Valley Hospital or whether he will desire education, and concession that he did not regress from May to August 1997, are unavailing, as is the argument that A.M. did not express an interest in education in a timely fashion. Therefore, the hearing officer's order that USD # 1 is responsible for one year of compensatory educational services after A.M.'s eligibility for special education under the IDEA expires will not be disturbed by this court.
The hearing officer also ordered:
 3. The parties are ORDERED to convene a PPT meeting not later than 45 days after the issuance of this decision for the purpose of developing an IEP for A., based A.'s unique needs and in compliance with the requirements of 20 U.S.C. § 1414 (d) (amended June 4, 1997) (amending 20 U.S.C. § 1401 (a)(20) (1990 Supp. 1997). In order to provide a statement in the IEP as to A.'s current level of education, it may be necessary to conduct testing to determine this level. A.'s IEP must also include a statement of the transition services that he will receive pursuant to 20 U.S.C. § 1401 (30) (amended June 4, 1997) (amending 20 U.S.C. § 1401 (a)(19) (1990 Supp. 1997). Lastly, as part of A.'s special education, his IEP must include instruction on the acquisition of community and daily living skills.
 4. The reports of Dr. Nelson Rivera shall be employed by the PPT to determine the type and the extent of psychological and counseling services that A. requires in order to benefit from special education.
(ROR, Final Decision and Order 97-153, p. 16).
The plaintiff here argues that the hearing officer's decision was in error because A.M.'s future educational needs are not immediately knowable and it is uncertain when A.M. will be released from CHV. In support of its argument, the plaintiff relies upon Unified School District # 1 v. Department ofEducation, 45 Conn. Sup. 57 (1997), which is distinguishable since there the order was for compensatory education at a specific institution two years in the future when that institution may not have been appropriate for the student's needs. Such is not the case here. The hearing officer's decision was justified by the evidence and proper. CT Page 1331
Finally, the plaintiff argues that the hearing officer erred in ordering USD # 1 to hold a PPT for A.M. based upon his unique needs after she had denied USD # 1's request for a release of A.M.'s current records at CVH. Addressing this argument the defendant A.M. has stated: "What is clear, a PPT will have to be held prior to A.M. receiving the one year compensatory education. At that time all necessary records will be available and an appropriate program will be designed." (Defendant A.M.'s Brief, p. 20.) This court will accept the defendant A.M.'s above representation that all necessary records will be made available for the PPT. Based on the defendant A.M.'s representation, then, the plaintiff's argument in this regard will be denied.
Based on the foregoing, the decision of the Department of Education in this matter is affirmed and the administrative appeal therefrom is dismissed.
___________________________ Michael Hartmere, Judge